

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* MICHELLE O'CONNOR, | CIVIL ACTION NO. 3 : I5CV551 |
| | JURY TRIAL DEMANDED |
| Plaintiffs, | |
| v. | **FILED UNDER SEAL** **As required by 31 U.S.C. § 3730(b)(2)** |
| NATIONAL SPINE AND PAIN CENTERS, LLC, THE CENTER FOR PAIN MANAGEMENT, LLC, PHYSICAL MEDICINE ASSOCIATES, LTD., NATIONAL SPINE AND PAIN CENTERS HOLDINGS, LLC, MANHATTAN SPINE & PAIN MEDICINE, P.C., NEW YORK PAIN CONSULTANTS LLC, SENTINEL CAPITAL PARTNERS, LLC, PRABAAL BOBBY DEY, MD, MICHAEL J. FABIAN, MAYO F. FRIEDLIS, MD, ASSAF T. GORDON, MD, DAVID S. LOBEL, MARC LOEV, MD, PAUL F. MURPHY, DOUGLAS W. WISOR, MD, and LESTER A. ZUCKERMAN, MD, | **DO NOT ENTER ON PUBLIC DOCKET OR PLACE IN PRESS BOX** |
| Defendants. | |

## COMPLAINT

## TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION.................................................................   1

II.   JURISDICTION AND VENUE............................................................   3

III.  PARTIES.......................................................................................   3

IV.   LEGAL FRAMEWORK....................................................................   8

      A.    The False Claims Act.............................................................   8

      B.    The Medicare Program...........................................................  10

      C.    The TRICARE Program..........................................................  10

      D.    The Federal Employees Health Benefits Program..........................  11

      E.    The Federal Employees' Compensation Program............................  11

V.    FACTUAL ALLEGATIONS..............................................................  12

      A.    National Spine's Principal Owners/Board Of Directors Are Defrauding
            The Federal Government To Boost The Company's Income And The
            Returns On Their Investment...................................................  12

      B.    The Board Of Directors Utilizes Financial Incentives To Induce Employees
            To Bill For Unnecessary Office Visits, Services And Orthopedic Braces.......  17

      C.    To Fraudulently Obtain Higher Reimbursements National Spine Is
            Misrepresenting That All Services Rendered By Mid-Level Providers,
            Including Unsupervised Services, Are Provided By The Patients' Physician...  19

            1.    The prerequisites for services furnished by mid-level providers
                  to be billed as "incident to services".................................  19

            2.    To fraudulently obtain higher government reimbursements
                  National Spine falsely bills all services provided by mid-level
                  providers under the name of the patients' physician, including
                  services for which there was no physician supervision...................  22

      D.    National Spine's Fraudulent Schemes Related To Opioid Therapy...............  30

            1.    National Spine fraudulently generates significant revenues by
                  requiring opioid therapy patients to attend unnecessary and
                  worthless monthly office visits........................................  30

i

2. National Spine overcharges the government for opioid therapy patients' monthly office visits.................................................. 31

3. National Spine routinely fraudulently bills the government for drug tests that are medically unnecessary and often worthless............ 32

*Coverage of drug screening for opioid therapy patients*.................. 32

*National Spine has a blanket order requiring that each opioid therapy patient receive a qualitative drug test for numerous drug classes during each office visit and also that every patient's urine sample be sent to an outside lab for confirmatory quantitative testing*............................................. 38

*Capitol Spine had a similar blanket order under which employees administered unnecessary qualitative drug tests on every opioid therapy patient during each office visit*...................... 44

E. National Spine Fraudulently Bills The Government For Ultrasounds That Are Both Medically Unnecessary And Worthless And Are Often Not Even Actually Performed.................................................. 45

F. National Spine Prescribes Orthopedic Braces To Patients Regardless Of Need Or Proper Fit.................................................................. 50

G. Schedule II Narcotics Were Routinely Illegally Dispensed From The In-House Pharmacy At The Fredericksburg Office............................ 52

H. National Spine Performs Medically Unnecessary Spinal Cord Stimulator Trials On Patients Who Are Poor Candidates For Permanent Therapy.......... 55

I. National Spine Fraudulently Billed The Government For Unnecessary Radiofrequency Ablation Procedures.................................... 57

J. National Spine Fraudulently Bills The Government For Unnecessary Pain Injections............................................................ 59

VI. COUNTS................................................................ 59

VII. PRAYER FOR RELIEF................................................... 65

VIII. JURY TRIAL DEMAND.................................................. 65

# I. NATURE OF THE ACTION

1.      Plaintiff relator Michelle O'Connor ("Relator") brings this qui tam action on behalf of the United States of America under the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, against National Spine and Pain Centers, LLC ("NSPC"), The Center for Pain Management, LLC ("CFPM"), Physical Medicine Associates, Ltd. ("Capitol Spine"), National Spine and Pain Centers Holdings, LLC ("NSPC Holdings"), Manhattan Spine & Pain Medicine, P.C. ("Manhattan Spine"), and New York Pain Consultants LLC ("New York Spine") (collectively, "National Spine" or the "Company") as well as the controlling owner of National Spine, Sentinel Capital Partners, LLC ("Sentinel") and National Spine's Board of Directors, which consists of the Company's principal owners and most senior executives, including Prabaal Bobby Dey, MD ("Dey"), Michael Fabian ("Fabian"), Mayo F. Friedlis, MD ("Friedlis"), Assaf T. Gordon, MD ("Gordon"), David Lobel ("Lobel"), Marc Loev, MD ("Loev"), Paul Murphy ("Murphy"), Douglas W. Wisor, MD ("Wisor"), and Les A. Zuckerman, MD ("Zuckerman") (collectively, the "Board of Directors" or the "Board"), to recover treble damages and civil penalties for knowingly presenting, causing to be presented, and/or conspiring to present false claims for payment to the Medicare program, TRICARE program, Federal Employees Health Benefits Program, and Federal Employees' Compensation Program (collectively, the "government healthcare programs").

2.      National Spine's core business is providing non-surgical pain management services, such as pain injections, opioid therapy, and other procedures to relieve back, neck, and joint pain, through a staff of over 100 healthcare providers who see patients in over 40 offices located in the District of Columbia, Maryland, New Jersey, New York, Virginia, and West

1

Virginia. National Spine derives over 50% of its revenue from the government healthcare programs.

3.    National Spine's Board, which consists of its founders and principal owners, including several physicians and three businessmen from private equity firm, Sentinel, who lack any formal medical training, closely manages the chain of pain management clinics, which is one of the largest – if not the largest – in the country. This group of entrepreneurial doctors and financiers, who joined together in early 2012, share a common objective – to maximize National Spine's profits and, correspondingly, the return on their investments. With a myopic focus on maximizing profits and the return on their investments, defendants have constructed a business platform that functions to generate as much revenue from each patient visit as possible, even going so far as cheating and defrauding patients and their insurers, including the government healthcare programs. For instance, National Spine has been substantially overcharging the government for services that its physician assistants and nurse practitioners (hereinafter collectively referred to as "mid-level providers") furnish to beneficiaries of the government healthcare programs. In addition, to fraudulently boost its profits, National Spine requires its employees to furnish medical services and ancillary services that are unnecessary, worthless, and, in some cases, even harmful to patients. Additionally, there are multiple other fraudulent and illegal practices occurring at National Spine to drive profits and its owners' return on their investments. In short, National Spine's Board is placing profits and investment returns before honesty, appropriate patient care, and patient and public safety. Before merging with National Spine in March 2012, Capitol Spine, under the leadership of defendants Friedlis, Gordon and Wisor, similarly engaged in many of these same fraudulent schemes and practices.

4.      Relator estimates that, through their systematic and pervasive fraudulent billing practices, National Spine, led by Sentinel and its Board of Directors, and Capitol Spine have defrauded the United States and taxpayers out of tens of millions of dollars.

## II. JURISDICTION AND VENUE

5.      Jurisdiction is founded upon the FCA, 31 U.S.C. §§ 3732(a) and (b), and also 28 U.S.C. §§ 1331 and 1345.

6.      Venue is proper in the Eastern District of Virginia under 31 U.S.C. § 3732(a), and sufficient contacts exist for jurisdiction in that many of the acts complained of occurred in this District and certain defendants maintain offices and/or transact business in this District.

## III. PARTIES

7.      The United States of America is the real party in interest to the claims of this action.

8.      Plaintiff relator Michelle O'Connor ("Relator") is a United States citizen and resides in Fredericksburg, Virginia. Relator holds a bachelor of science in physician assistant studies and a master of health administration and has been a board certified physician assistant since 2003. Relator also served as an officer in the United States Army from 1989 to 1998. From March 2010 to March 2012, Relator was employed by defendant Capitol Spine. After Capitol Spine and NSPC merged in March 2012, Relator worked for the combined Company until June 3, 2013. Throughout her tenure working with these defendants, Relator served as a physician assistant, under the supervision of defendant Wisor, at the offices located in Fredericksburg, Virginia (the "Fredericksburg office") and Glen Allen, Virginia (the "Glen Allen office"). More particularly, from April 2010 to September 2012, Relator worked under Wisor's supervision at the Glen Allen office every Monday and Wednesday and at the Fredericksburg office every

Tuesday, Thursday, and Friday. Thereafter, from September 2012 to June 2013, Relator worked

Monday through Friday under Wisor's supervision at the Fredericksburg office. Inasmuch as

Relator's workstation was directly outside of Wisor's office, she knew when he was present in

the office and could also frequently hear the meetings and discussions occurring inside his office.

Wisor terminated Relator in June 2013 for complaining about the unlawful practices alleged

below.

9.      Defendant National Spine and Pain Centers, LLC (d/b/a National Spine & Pain

Centers) ("NSPC"), a Delaware limited liability company, owns and operates medical practices

that focus on providing non-surgical pain management services. NSPC maintains its principal

offices at 11921 Rockville Pike, Suite 505, Rockville, Maryland 20852. NSPC is an affiliate of

defendants CFPM, Capitol Spine, NSPC Holdings, Manhattan Spine, and New York Spine.

10.     Defendant The Center for Pain Management, LLC (also d/b/a The Spine Center as

well as National Spine & Pain Centers) ("CFPM"), a Maryland limited liability company, owns

and operates medical practices that focus on providing non-surgical pain management services.

CFPM maintains its principal offices at 11921 Rockville Pike, Suite 505, Rockville, Maryland

20852. CFPM is an affiliate of defendants NSPC, Capitol Spine, NSPC Holdings, Manhattan

Spine, and New York Spine.

11.     Defendant Physical Medicine Associates, Ltd. (d/b/a Capitol Spine & Pain

Centers and National Spine & Pain Centers) ("Capitol Spine"), a Virginia corporation, owns and

operates medical practices that focus on providing non-surgical pain management services.

Capitol Spine maintains an office at 3031 Javier Road, Suite 210, Fairfax, Virginia 22031.

Capitol Spine merged with NSPC and CFPM in March 2012 (the "Merger"). Capitol Spine is

also an affiliate of defendants NSPC Holdings, Manhattan Spine, and New York Spine. Before

4

the Merger, Mayo Friedlis, MD, served as Capitol Spine's Chief Executive Officer and President, Douglas Wisor, MD, oversaw accounting and marketing, and Assaf Gordon, MD, oversaw billing, compliance, and physician assistants. Before the Merger, Capitol Spine's principal offices were located at 3031 Javier Road, Suite 210, Fairfax, Virginia 22031.

12.     Defendant National Spine and Pain Centers Holdings, LLC ("NSPC Holdings"), a Delaware limited liability company, owns and operates defendants NSPC, CFPM, and Capitol Spine. NSPC Holdings maintains its principal offices at 11921 Rockville Pike, Suite 505, Rockville, Maryland 20852. NSPC Holdings is also an affiliate or owner of defendants Manhattan Spine and New York Spine.

13.     Defendant Manhattan Spine & Pain Medicine, P.C. ("Manhattan Spine"), a New York professional corporation, owns and operates medical practices that focus on providing non-surgical pain management services. Manhattan Spine maintains an office at 115 East 57th Street, Suite 610, New York, New York 10022. In 2013, Manhattan Spine was acquired by or became affiliated with NSPC or NSPC Holdings. Manhattan Spine is also an affiliate of CFPM, Capitol Spine, and New York Spine.

14.     Defendant New York Pain Consultants LLC (d/b/a New York Spine & Pain Physicians) ("New York Spine"), a New York limited liability company, owns and operates medical practices that focus on providing non-surgical pain management services. New York Spine maintains an office at 500 West Main Street, Suite 116, Babylon, New York 11702. In December 2012, New York Spine was acquired by or became affiliated with NSPC or NSPC Holdings. New York Spine is also an affiliate of CFPM, Capitol Spine, and Manhattan Spine.

15.     Defendants NSPC, CFPM, Capitol Spine, NSPC Holdings, Manhattan Spine, and New York Spine are collectively referred to herein as "National Spine." The financial and

operational management, supervision, control, and reporting by and between NSPC, CFPM,

Capitol Spine, NSPC Holdings, Manhattan Spine, and New York Spine has been so inextricably

intertwined that in effect they have functioned as one single entity. National Spine is one of the

largest chains – if not the largest chain – of non-surgical pain management practices in the

United States, employing approximately 100 healthcare practitioners and operating

approximately 40 pain management clinics across the District of Columbia, Maryland, New

Jersey, New York, Virginia, and West Virginia, including in the following locations:

- Washington, D.C.
- Bel Air, MD
- Bowie, MD
- Chevy Chase, MD
- Clinton, MD
- Columbia, MD
- Cumberland, MD
- Frederick, MD
- Germantown, MD
- Glen Burnie, MD
- Greenbelt, MD
- Hagerstown, MD
- National Harbor, MD
- Pikesville, MD
- Rockville, MD
- Silver Spring, MD

- Waldorf, MD
- White Marsh, MD
- Edison, NJ
- Jackson, NJ
- South Amboy, NJ
- Babylon, NY
- Babylon Village, NY
- Bay Shore, NY
- Manhattan, NY
- New Hyde Park, NY
- Alexandria, VA
- Arlington, VA (Ballston)
- Arlington, VA (Shirlington)
- Centreville, VA
- Fairfax, VA
- Fredericksburg, VA

- Front Royal, VA
- Glen Allen, VA
- Harrisonburg, VA
- Haymarket, VA
- Lansdowne, VA
- Lynchburg, VA
- Manassas, VA
- McLean, VA
- Mt. Vernon, VA
- Reston, VA
- Richmond, VA
- Roanoke, VA
- Tysons Corner, VA
- Winchester, VA
- Woodbridge, VA
- Martinsburg, WV

National Spine maintains its principal offices at 11921 Rockville Pike, Suite 505, Rockville,

Maryland 20852.

16.     Defendant Sentinel Capital Partners, LLC ("Sentinel"), a Delaware limited

liability company, is a private equity firm that maintains its principal offices at 330 Madison

Avenue, 27th Floor, New York, New York 10017. Sentinel acquired a controlling interest in

NSPC Holdings and/or NSPC through a recapitalization that occurred on or about September 27,

2011 after which Sentinel and NSPC promptly expanded NSPC's business through a series of

mergers and acquisitions, including Capitol Spine (on or about March 23, 2012), New York Spine (in December 2012), and Manhattan Spine (in 2013). As a result of its controlling ownership interest in National Spine, Sentinel has three seats on National Spine's Board.

17.     Defendant Prabaal Bobby Dey, MD, ("Dey") resides in Maryland and practiced pain management medicine at National Spine's Rockville, Maryland office until January 2013. Dey was a co-founder of CFPM and NSPC and was a member of National Spine's Board of Directors until January 2013.

18.     Defendant Michael J. Fabian ("Fabian") is a partner of Sentinel and is a member of National Spine's Board of Directors. Fabian holds a master of arts in economics and also holds the chartered financial analyst designation.

19.     Defendant Mayo F. Friedlis, MD, ("Friedlis") resides in Virginia and practices pain management medicine at National Spine's Chevy Chase, Maryland and Tysons Corner, Virginia offices. Friedlis was a co-founder of Capitol Spine and is currently a member of National Spine's Board of Directors.

20.     Defendant Assaf T. Gordon, MD, ("Gordon") resides in Maryland and practices pain management medicine at National Spine's Arlington, Virginia (Shirlington) and Washington, D.C. offices. Gordon was a co-founder of Capitol Spine and is currently a member of National Spine's Board of Directors.

21.     Defendant David S. Lobel ("Lobel") is the managing partner of Sentinel and is a member of National Spine's Board of Directors. Lobel holds an MBA.

22.     Defendant Marc Loev, MD, ("Loev") resides in Maryland and serves as National Spine's Director of Strategic Initiatives and is also the Vice Chairman of National Spine's Board of Directors. Loev was a co-founder of CFPM and NSPC.

23.     Defendant Paul F. Murphy ("Murphy") is a partner of Sentinel and is a member of National Spine's Board of Directors. Murphy holds an MBA.

24.     Defendant Douglas W. Wisor, MD, ("Wisor") resides in Virginia and practices pain management medicine at National Spine's Fredericksburg and Glen Allen offices. Wisor was a co-founder of Capitol Spine and is currently the Vice Chairman of National Spine's Board of Directors as well as its Chief Development Officer. Also, Wisor served as the President of National Spine from spring 2012 until early 2014.

25.     Lester A. Zuckerman, MD, ("Zuckerman") resides in Maryland and practices pain management medicine at National Spine's Rockville, Maryland office. Zuckerman was a co-founder of CFPM and NSPC and is currently a member of National Spine's Board of Directors.

26.     Defendants Prabaal Bobby Dey, MD, Michael Fabian, Mayo F. Friedlis, MD, Assaf T. Gordon, MD, David Lobel, Marc Loev, MD, Paul Murphy, Douglas W. Wisor, MD, and Les A. Zuckerman, MD, are collectively referred to herein as the "Board of Directors" or the "Board." Defendants National Spine and Pain Centers, LLC, The Center for Pain Management, LLC, Physical Medicine Associates, Ltd., National Spine and Pain Centers Holdings, LLC, Manhattan Spine & Pain Medicine, P.C., New York Pain Consultants LLC, Sentinel Capital Partners, LLC, Prabaal Bobby Dey, MD, Michael Fabian, Mayo F. Friedlis, MD, Assaf T. Gordon, MD, David Lobel, Marc Loev, MD, Paul Murphy, Douglas W. Wisor, MD, and Les A. Zuckerman, MD, are collectively referred to herein as the "Defendants."

## IV. LEGAL FRAMEWORK

### A.     The False Claims Act

27.     The FCA provides, in relevant part, that any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B) … or (G); [or]

***

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money … to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money … to the Government,

is liable to the United States Government for [statutory damages and such penalties as are allowed by law].

31 U.S.C. §§ 3729(a)(1)(A)-(C), (G).

28.     Section 3729(a)(1) of the FCA provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person, plus a civil penalty of $5,000 to $10,000 per violation. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, 64 Fed. Reg. 47099, 47103 (1999), and 28 C.F.R. § 85.3, the FCA's civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

29.     The terms "knowing" and "knowingly" are defined at 31 U.S.C. § 3729(b)(1)(A) to mean that a person who, with respect to information:

(i)   has actual knowledge of the information;

(ii)  acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information.

No proof of specific intent to defraud is required. *See* 31 U.S.C. § 3729(b)(1)(B).

## B.    The Medicare Program

30.    The United States, through the Department of Health and Human Services ("HHS"), administers the Supplementary Medical Insurance Program for the Aged and Disabled established by Part B, Title XVIII, of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* ("Medicare"). The Centers for Medicare and Medicaid Services ("CMS") is part of HHS and is directly responsible for the administration of the Medicare Program.

31.    Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426A. Part A of the Medicare Program covers surgical procedures performed in the hospital setting, while Part B of the Medicare Program authorizes payment of federal funds for medical and other health services, including physician services, laboratory services, outpatient therapy, diagnostic services, and radiology services.

32.    Medical necessity is a fundamental requirement for Medicare coverage. Medicare does not cover any expenses incurred for items or services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury …." 42 U.S.C. § 1395y(a)(1)(A); Medicare Benefits Policy Manual, ch. 16 § 20 (Rev. 1, 10-01-03).

## C.    The TRICARE Program

33.    TRICARE (formerly known as CHAMPUS) is a health care program of the United States Department of Defense that provides medical insurance for healthcare services furnished by civilian providers, physicians, and suppliers to active duty service members, National Guard and Reserve members, retirees, their families, survivors, and certain former spouses.

34.    TRICARE's prerequisites for reimbursement are generally analogous to those of the Medicare program. TRICARE covers only medically necessary services and supplies.

TRICARE defines medically necessary care as services or supplies provided by a hospital, physician, and/or other provider for the prevention, diagnosis, and treatment of an illness, when those services or supplies are determined to be consistent with the condition, illness, or injury; provided in accordance with approved and generally accepted medical or surgical practice; not primarily for the convenience of the patient, the physician, or other providers; and not exceeding (in duration or intensity) the level of care which is needed to provide safe, adequate, and appropriate diagnosis and treatments. *See* 10 C.F.R. § 199.4(a)(1)(i) and applicable definitions at 10 C.F.R. § 199.2.

### D.    The Federal Employees Health Benefits Program

35.    The Federal Employee Health Benefits Program ("FEHBP") provides health care benefits, including prescription drugs, to federal employees, former employees, and survivors. The various FEHBP healthcare plans restrict coverage to care and services that are medically necessary. The prerequisites for reimbursement are generally analogous to those of the Medicare program.

### E.    The Federal Employees' Compensation Program

36.    The Federal Employees' Compensation Act provides workers' compensation coverage, including payment of medical expenses, to three million federal and postal workers for employment-related injuries and occupational diseases. The various Federal Employees' Compensation Program plans restrict coverage to care and services that are medically necessary. The prerequisites for reimbursement are generally analogous to those of the Medicare program.

37.    Medicare, TRICARE, FEHBP, and the Federal Employees' Compensation Program are collectively referred to herein as the "federal healthcare programs."

11

## V.  FACTUAL ALLEGATIONS

**A.     National Spine's Principal Owners/Board Of Directors Are Defrauding The Federal Government To Boost The Company's Income And The Returns On Their Investment**

38.     As a private equity fund with approximately $26 billion under management, Sentinel "pursue[s] investment opportunities that can generate high risk-adjusted returns." Sentinel, Overview, http://www.sentinelpartners.com/secondary.asp?pageID=27 (last visited Sep. 2, 2015). To achieve such "high risk-adjusted returns," Sentinel partners with its portfolio companies' management and provides its business and financial expertise to increase the profitability of the businesses and thereby grow the value of its investment. On its corporate website, Sentinel describes its investment philosophy as follows:

> Sentinel works as a team, makes collaborative, consensus decisions, and provides portfolio executives broad access to our resources and the perspectives of our professionals.
>
> ***
>
> Each Sentinel deal team consists of several professionals who work closely with each portfolio company. This level of commitment enables our management partners to have full access to our resources and benefit from the multiple perspectives of our professionals.
>
> Sentinel's approach is to make relatively few investments every year to ensure that our portfolio companies get the attention and support we believe they deserve. Our interests are therefore closely aligned with those of our management partners: we share a significant commitment to, and a vested interest in, the success of each portfolio company.
>
> We assist with strategy development; identify and help execute add-on acquisitions; optimize balance sheet capitalization; structure attractive compensation arrangements that align interests; and generally help and advise our management partners. We do not interfere in day-to-day operations.

Sentinel, Investment Philosophy, http://www.sentinelpartners.com/secondary.asp?pageID=20 (last visited Sep. 2, 2015). Similarly, Sentinel touts that holding seats on portfolio companies' boards "allows us to make the maximum contribution to their success" and that by focusing on

12

fewer large investments it can "commit considerable time and resources to each company in [its] portfolio." Sentinel, Who We Are, http://www.sentinelpartners.com/secondary.asp?pageID=14 (last visited Sep. 2, 2015).

39.     Under Sentinel's stewardship, National Spine has rapidly grown into one of the largest – if not the largest – chain of pain management clinics in the United States. In March 2012, Sentinel reported that, during 2011, National Spine had 22 facilities and treated approximately 40,000 patients. Sentinel, *National Spine & Pain Centers and Capitol Spine & Pain Centers Merge to Form Leading Provider of Interventional Pain Management Treatment*, Mar. 23, 2012, http://www.sentinelpartners.com/int_news.asp?pageID=93. In contrast, for 2012, Sentinel reported that National Spine had treated more than 160,000 patients – four times the number of patients it treated in 2011 – at over 30 different offices. Sentinel, National Spine Profile, http://www.sentinelpartners.com/print_company.asp?pageID=50 (last visited Sep. 2, 2015). Hence, during Sentinel's first year of ownership, National Spine experienced a 400% increase in patient visits while adding just 8 offices.

40.     National Spine's largest expansion maneuver was its merger with Capitol Spine in March 2012 (the "Merger"). Like its merger partner, Capitol Spine was a profit-driven chain of pain management practices.

41.     The following public statements concerning the Merger from National Spine's co-founders (Dey, Love and Zuckerman), Capitol Spine's co-founders (Friedlis, Wisor and Gordon), and Sentinel's Paul Murphy evidence that National Spine's Board of Directors, which includes each of these individuals, was unified in their objectives for the Company going forward:

> "Our two businesses are the leaders in providing advanced, minimally invasive treatment options for patients in the Mid-Atlantic region," said Drs. Bobby Dey,

Marc Loev and Les Zuckerman, co-founders of National Spine & Pain Centers. "Our two organizations have the same mission—to provide a comprehensive approach to the treatment of pain through the use of advanced, minimally invasive, interventional procedures. We also have highly compatible cultures, and look forward to working closely with Capitol Spine & Pain Centers' talented management team to expand the breadth of our services and our presence throughout the Mid-Atlantic."

"We are very proud of everything that we have achieved and are excited about joining with National Spine & Pain Centers to create a true market leader," said Drs. Mayo Friedlis, Doug Wisor and Assaf Gordon, board members of Capitol Spine & Pain Centers. "We have seen the success of National Spine & Pain Centers' partnership with Sentinel, a private equity firm with a great track record of supporting management teams seeking to build stronger healthcare businesses. We are very excited to join this partnership."

"With chronic and debilitating pain affecting more people in the United States than diabetes, heart disease and cancer combined, National Spine & Pain Centers addresses a crucial need for its patients and is well positioned in an exciting and fast growing healthcare specialty," said Paul Murphy, a partner at Sentinel. "We are proud to be partners with these two extraordinary groups as they endeavor to integrate and grow their business."

Sentinel, *National Spine & Pain Centers and Capitol Spine & Pain Centers Merge to*

*Form Leading Provider of Interventional Pain Management Treatment*, Mar. 23, 2012,

http://www.sentinelpartners.com/int_news.asp?pageID=93.

42.     A profile that was posted on National Spine's website in 2013 credited Wisor

with instituting the initiatives that enabled Capitol Spine to significantly grow its revenue in the

months and years leading up to the Merger:

> Under [Wisor's] financial leadership, Capitol Spine became one of the largest outpatient pain practices in the United States and grew from a relatively flat revenue curve at $7.2 million in 2002 to near $27 million in 2011 (or a 274% increase). By cultivating a regionally branded pain management practice, his profitable growth initiatives concluded with a strategic private equity transaction with Sentinel Capital Partners in March of 2012.

National Spine, Board of Directors, https://web.archive.org/web/20130104164053/http://

nationalspineandpaincenters.com/.

14

43.     At all relevant times, National Spine's Board of Directors has consisted of CFPM and NSPC's founders, Capitol Spine's founders, and three partners within Sentinel and has acted as National Spine's most senior governing body. During the relevant period, National Spine's Board has included the following defendants:

- Vice Chairman - Marc Loev, MD (co-founder of CFPM and NSPC)
- Vice Chairman - Douglas Wisor, MD (co-founder of Capitol Spine)
- Prabaal B. Dey, MD (co-founder of CFPM and NSPC)
- Michael Fabian, CFA (Partner of Sentinel)
- Mayo Friedlis, MD (co-founder of Capitol Spine)
- Assaf Gordon, MD (co-founder of Capitol Spine)
- David Lobel, MBA (Managing Partner of Sentinel)
- Paul Murphy, MBA (Partner of Sentinel)
- Les Zuckerman, MD (co-founder of CFPM and NSPC)

44.     Attorney David Vaughn of Vaughn & Associates, LLC in Baton Rouge, Louisiana serves as National Spine's Corporate Compliance Officer. While serving as the President of Anglo American Insurance Company, Mr. Vaughn directed his secretary to sign his name to false financial statements that he knew misrepresented the amount of the company's surplus to the Louisiana Commissioner of Insurance. Anglo American was liquidated and eventually failed, causing a substantial loss to its claimants and Louisiana taxpayers. In April 1993, Mr. Vaughn pled guilty to three counts of mail fraud. The U.S. District Court for the Eastern District of Louisiana sentenced Mr. Vaughn to 18 months of imprisonment and three years of supervised probation. Additionally, the Supreme Court of Louisiana suspended Mr. Vaughn's law license from June 1993 to September 1997 as a result of his crimes. *See In re David M. Vaughn*, No. 95-B-0810, 660 So.2d 1202 (La. 1995).

45.     Relator, who worked for Wisor and Capitol Spine for two years prior to the Merger and also worked with Wisor and National Spine for another 15 months thereafter, witnessed firsthand Capitol Spine, National Spine, Sentinel and National Spine's Board develop

and implement multiple systematic fraudulent schemes to increase revenues and profits and thereby increase their own personal returns on their investments and wealth. The substantial revenue and profits generated through these schemes came at the expense of the government healthcare programs and patients.

46.    The more significant revenue-generating schemes that involve beneficiaries of the government healthcare programs, which Relator estimates accounts for at least 50% of National Spine's patient base, include among others:

- Routinely overcharging the government for unsupervised services rendered by mid-level providers by billing for these services as though they are rendered by the patients' physician;

- Requiring all opioid therapy patients to attend an office visit every 30 days (rather than every 90 days) so that it can bill for more office visits and services;

- Routinely overcharging the government for the basic evaluation that mid-level providers furnish to opioid therapy patients during their monthly visits;

- Automatically performing a battery of unnecessary drug tests on all opioid therapy patients during each office visit;

- Routinely performing and billing for unnecessary and worthless ultrasounds in connection with numerous types of pain injections;

- Routinely prescribing costly orthopedic braces that are unnecessary and worthless;

- Illegally dispensing narcotics from the Fredericksburg office;

- Performing unnecessary spinal cord stimulator trials on patients who are poor candidates for permanent spinal cord stimulation therapy;

- Performing unnecessary radiofrequency ablation procedures; and

- Performing unnecessary pain injections.

47.    These schemes are part of a business model that is reliant upon keeping patients on a continuous pain management treatment cycle: exhaust coverage of injections; provide orthopedic braces; perform procedures such as a spinal cord stimulation or radiofrequency

ablation; prescribe opioids; recommence pain injections …. In sum, National Spine's Board has created a corporate culture in which money trumps the provision of appropriate patient care.

**B.      The Board Utilizes Financial Incentives To Induce Employees To Bill For Unnecessary Office Visits, Services, And Orthopedic Braces**

48.      National Spine's Board utilizes bonus and award systems as well as revenue and patient quotas to induce employees to comply with its fraudulent, profit-driven policies and requirements. At the same time, it closely monitors employees' performance and compliance with its policies and requirements.

49.      More particularly, National Spine pays quarterly bonuses to physicians who generate more than their salary in revenue from pain management services, "ancillary services" such as drug tests and ultrasounds, and sales of orthopedic braces. It is not unusual for a physician's quarterly bonus to exceed $10,000. Physicians must generate enough revenue to cover their salary to qualify for a bonus and to be eligible for obtaining a small ownership interest in the practice. And, if a physician repeatedly fails to meet their revenue requirement, then National Spine reserves the right to terminate the physician. A similar bonus system was in place at Capitol Spine before the Merger.

50.      National Spine pays mid-level providers two bonuses – a quarterly bonus and a semi-annual bonus. The quarterly bonus is based on the amount of revenue that the mid-level provider generates from "ancillary services," such as ultrasounds, and sales of orthopedic braces. The quarterly bonuses paid to mid-level providers frequently exceed $2,500. Mid-level providers also receive a semi-annual bonus based on the amount of revenue they generate through the provision of pain management services. The semi-annual bonus can be as much as $5,000. Before the Merger, Capitol Spine only paid physician assistants an annual bonus, which was based on the revenue they generated by providing pain management services.

51.     Similarly, National Spine expects mid-level providers to see a minimum of 25 patients per day. If a mid-level provider does not satisfy this requirement, they are counseled by their supervising physician. If a mid-level provider continues to miss this daily minimum requirement, National Spine will effectively force them out by requiring them to cover additional offices and overwhelming them with an unmanageable workload. Before the Merger, Capitol Spine required mid-level providers to see approximately 16 to 18 patients per day.

52.     In addition, National Spine pays quarterly bonuses to office managers and medical assistants based on the volume of drug tests performed at their office and the volume of orthopedic brace fittings that the medical assistants perform. Capitol Spine did not pay bonuses to office managers or medical assistants.

53.     National Spine's Board closely monitors physicians', mid-level providers', and medical assistants' compliance with the Company's revenue maximization policies and requirements. The Board holds a telephonic meeting every morning during which the board members not only review the Company's ongoing operations and financial results but also closely track employees' compliance with various Board-instituted performance requirements, focusing on each individual employee's revenue generation, using metrics such as volume of patients seen, services performed, and orthopedic braces sold. Wisor maintains a spreadsheet on the computer in his office through which he carefully records and tracks, by office and provider, several categories of revenue including, revenue from pain management services, revenue from "ancillary services," as well as revenue from sales of orthopedic braces. National Spine frequently sends emails to employees in which physicians and offices are ranked by how much revenue they have generated and also report the volume of drug tests performed and orthopedic

braces sold by each office. When results are not in line with the requirements imposed by the Board, employees are openly ridiculed and counseled.

54.     Generally, at least once a month, National Spine's Board members attend meetings at Sentinel's office in Manhattan. All Board members, other executives, and physicians must also attend a monthly meeting at National Spine's headquarters in Rockville, Maryland, to discuss revenue generation and other issues.[1] In addition, National Spine holds biannual organizational meetings at the Fairview Park Marriott in Falls Church, Virginia, where revenue generation compliance and strategies are always among the key topics of discussion.

**C.     To Fraudulently Obtain Higher Reimbursements National Spine Is Misrepresenting That All Services Rendered By Mid-Level Providers, Including Unsupervised Services, Are Provided By The Patients' Physician**

**1.     The prerequisites for services furnished by mid-level providers to be billed as "incident to services"**

55.     In general, the reimbursement rate for services rendered by mid-level providers is 85% of the rate published in the Medicare Physician Fee Schedule ("PFS"). *See* 42 C.F.R. §§ 414.52(d) & 415.56(c).

56.     However, when mid-level providers furnish services and supplies that are an incidental part of personal professional services in the course of treatment of an injury or illness ordered by a physician (the "ordering physician") and such services are furnished under the direct supervision of a physician, then the services qualify as an "incident to service" that the government healthcare programs treat as services furnished by the billing physician for purposes of billing and payment. Accordingly, when a mid-level provider furnishes an "incident to service" the government will reimburse the billing physician or their clinic 100% of the PFS

---

[1] Before the Merger, Capitol Spine similarly held a monthly meeting in Fairfax, Virginia, that all physicians were required to attend.

amount (rather than 85%). *See* 42 C.F.R. § 410.26(b)(5); *see also* Medicare Benefit Policy

Manual ch.15, §§ 60.1 & .2. The physician directly supervising the mid-level provider need not

be the same physician upon whose professional service the "incident to service" is based. *Id.* The

physician who bills for the incident to service must be the physician who directly supervises the

service because it is that physician who had a personal role in, and responsibility for, the services

for which the government is billed.

57.    "Direct supervision" in the office setting means that the physician must be present

in the office suite and immediately available to furnish assistance and direction throughout the

performance of the procedure. 42 C.F.R. § 410.32(b)(3)(ii). The physician is not required to be

present in the room where the procedure is performed. *See id.*

58.    When billing for a service furnished by a mid-level provider that was incident to

an ordering physician's services and that was directly supervised by the ordering physician, the

ordering physician is to be identified as the rendering provider on the bill (CMS Form 1500) and

she or he must also sign the bill. *See* Medicare Claims Processing Manual, ch.26, § 10.4.

59.    When billing for a service furnished by a mid-level provider that was incident to

an ordering physician's services but a physician other than the ordering physician directly

supervised the service, the physician who directly supervised the mid-level provider – not the

ordering physician – is deemed to be the rendering provider on the bill and she or he must also

sign the bill. *See id.* Said differently, the service should not be billed under the ordering

physician's billing number unless that physician also directly supervised the mid-level provider

when they furnished the service. Instead, in this situation the service must be billed under the

name of the physician who directly supervised the service.

20

60.     *If the mid-level provider furnishes services that may otherwise be incident to an ordering physician's services but there is no physician present in the office, or there is a physician present but they are not immediately available to give assistance and direction throughout the performance of the service, then the service does not qualify as an incident to service because it was not directly supervised by a physician. In such case, the mid-level provider must be identified as the rendering provider on the bill, and the mid-level provider must also sign the bill.* And, under this scenario, the government reimburses the clinic for the service rendered by the mid-level provider at 85% of the applicable rate published in the PFS.

61.     Services that physicians and mid-level providers render to beneficiaries of the government healthcare programs are billed to the government using Form CMS-1500. In signing Form CMS-1500, the physician makes express certifications that he or she has complied with the regulatory requirements for billing for "incident to services":

> In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) **the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reported in the designated section. For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills.**

* * *

NOTICE: Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

(Emphasis added).

> **2.    To fraudulently obtain higher reimbursements from the government National Spine falsely bills all services provided by mid-level providers under the name of the patients' physician, including services for which there was no physician supervision**

62.    From at least March 2012 to the present, National Spine has automatically billed all services furnished by mid-level providers as incident to services under the name of the ordering physician regardless of whether or not such services qualify as incident to services under 42 C.F.R. § 410.27.[2] In fact, they routinely do not qualify as "incident to services" because at the time the mid-level providers furnished the service there was no physician – neither the ordering physician nor a supervisory physician – present in the office suite.

63.    In addition, when the ordering physician was not in the office suite and only a supervisory physician was present when the mid-level providers furnished the services, National Spine typically bills for such services furnished by the mid-level providers as incident to services and misrepresents on the bills submitted to the government that the ordering physician was the rendering provider and has the ordering physician improperly sign the bills.

64.    Oftentimes the ordering physician is not working at all – *i.e.*, is either on vacation, attending a conference, playing golf, or at home – on days when the mid-level providers furnish

---

[2] Under National Spine's billing process, the various offices submit billing information to the central billing department at the Rockville, Maryland headquarters. The billing department then transmits the information to third-party billing company, ALN Medical Management, LLC, which maintains its principal offices in Centennial, Colorado, for submission to the applicable government healthcare program. Before the Merger, Capitol Spine's various offices submitted their billing information to the billing department at the Fairfax, Virginia office which then transmitted the information to a third-party billing company for submission to the government healthcare programs.

services that are fraudulently billed as though the ordering physician provided them. Here again, on many of these days there is no physician in the office to provide direct supervision.

65. National Spine is submitting these claims for payment for services that are factually false in order to receive a higher reimbursement for the services rendered by mid-level providers – 100%, rather than 85%, of the PFS rate.

66. Capitol Spine similarly engaged in this same fraudulent practice the entire period that Relator worked there.

67. An examination of physicians' billing histories substantiate the existence of this fraud because it reveals multiple bills from the same physician for services provided at different offices on the same day. In other words, services Relator furnished at the Fredericksburg office were billed as incident to services and the bill identifies Wisor as the rendering provider and signatory. However, other bills from that same day identify Wisor as providing services at the Glen Allen office.

68. For instance, the services Relator provided between January 2013 to June 3, 2013 to the following patients at the Fredericksburg and Glen Allen offices were all falsely billed as though Wisor provided the service even though neither Wisor, nor any other physician, was present in the office suite when these patients were seen:

| Patient | Insurer |
|---------|---------|
| DB | Medicare |
| TM | Medicare |
| EN | TRICARE |
| GT | TRICARE |
| MT | TRICARE |

69. Similarly, in May 2013, services that Relator provided to the following patients, among others, at the Fredericksburg office were billed under Wisor's name even though Wisor

spent the entire day working at the Fairfax, Virginia office (the "Fairfax office") covering for Dr. Virgil Balint who was out of the office for two weeks[3]:

| Patient | Date of Service | Insurer |
|---------|-----------------|---------|
| YS | May 28, 2013 | TRICARE |
| SD | May 30, 2013 | TRICARE |
| CT | May 30, 2013 | TRICARE |
| RC | May 31, 2013 | TRICARE |
| SD | May 31, 2013 | TRICARE |
| JJ | May 31, 2013 | TRICARE |
| TL | May 31, 2013 | TRICARE |

70.      By way of further example, Wisor billed for services that Relator provided to Medicare patients on the following dates when he was not working:

| Dates of Absence | Reason for Absence |
|------------------|--------------------|
| Dec. 9-11, 2011 | Attending the N. Am. Neuromodulation Society's Annual Meeting in Las Vegas |
| Dec. 6-9, 2012 | Attending the N. Am. Neuromodulation Society's Annual Meeting in Las Vegas |
| Jan. 25-Feb. 1, 2013 | On vacation in Kiawah Island, South Carolina |
| Apr. 1-5, 2013 | On vacation at Disney World in Florida |
| Apr. 7-10, 2013 | Attending a family member's funeral in Buffalo, New York |

71.      In 2010 and 2011, Dr. Wisor took vacation time on days that his children were off from school as well as from April 24 to 28, 2011. The only other physician working at the Glen Allen office at the time was Dr. Lagowsky, who also took vacation time on days when her children were off from school. Accordingly, on each of those days, Relator furnished services to Dr. Wisor's patients while no physician was in the office. Yet all of those services were fraudulently billed under Dr. Wisor's name even though they did not qualify as incident to services. For example, from December 20 to 31, 2010, the services Relator furnished to the following patients at the Glen Allen office while no physician was present in the office were fraudulently billed as though Dr. Wisor provided the service:

---

[3] The only physician present in the office on these dates was a locum tenen who was not credentialed to see patients in Virginia.

24

| Patient | Insurer |
|---------|---------|
| DL | Medicare |
| VD | Medicare |
| JG | Medicare |
| BG | Medicare |
| BM | Medicare |
| EN | TRICARE |
| CR | TRICARE |
| TS | TRICARE |

72.     In addition, throughout the period that Relator was employed by Capitol Spine and National Spine, Wisor frequently did not work on Fridays. However, Relator worked on Fridays and saw patients. All the services that Relator provided to patients while Wisor was out of the office on Fridays – or any other day – were fraudulently billed to the government under Wisor's name as though he had provided the services.

73.     To make matters worse, frequently there was no physician even in the office suite when Relator furnished services that were billed under Wisor's name and signature.[4] Specific examples of patients from the Glen Allen and Fredericksburg offices to whom Relator provided all of their follow-up services that were nevertheless billed as though they were provided by Wisor even though neither Wisor, nor any other physician, was present in the office when Relator provided the services include:

| Patient | Approximate Dates of Service | Insurer |
|---------|------------------------------|---------|
| TS | 2011 - June 2013 | TRICARE |
| DK | 2012 - June 2013 | Medicare |
| GW | 2012 - June 2013 | Medicare |
| JM | 2012 - June 2013 | Medicare |
| MS | 2012 - June 2013 | TRICARE |
| TH | 2012 - June 2013 | Medicare |

74.     Moreover, although all services provided by mid-level providers are billed as incident to services, in many cases National Spine's physicians, including Wisor, took no interest

---

[4] From April 2010 to September 2012, Dr. Suzanne Lagosky worked on Fridays at the Glen Allen office. Dr. Lagosky, however, refused to supervise Relator.

in and had essentially no involvement in the patients' treatment after the initial visit. Indeed,

many of the patients Relator treated should have been re-evaluated by Wisor because there was a

change in their medical condition or they were not responding to the treatment plan that Wisor

initially prescribed. Inasmuch as the patient was being treated for a new problem or Relator had

to deviate from Wisor's treatment plan, these services did not qualify as incident to services and

consequently should not have been billed under Wisor's name. Examples of patients who

received treatment at the Fredericksburg and/or Glen Allen offices from a mid-level provider that

was either for new symptoms or deviated from the initial treatment plan but was nevertheless

still billed as an incident to service under the name of a physician include:

| Patient | Approximate Date of Service | Insurer |
|---------|------------------------------|---------|
| AJ | Sep. 2012 - June 2013 | Medicare |
| AM | Late 2010 - March 2013 | TRICARE |
| AN | Sep. 2012 - June 2013 | Medicare |
| AS | 2010 | Medicare |
| BG | Sep. 2012 - June 2013 | Medicare |
| CH | Sep. 2012 - June 2013 | Medicare |
| CL | Sep. 2012 - June 2013 | TRICARE |
| CR | Mar. 2010 - June 2012 | Fed. Workers' Comp. |
| CT | Sep. 2012 - June 2013 | TRICARE |
| DB | Sep. 2012 - June 2013 | TRICARE |
| DF | Late 2012 - June 2013 | Medicare |
| ES | Sep. 2012 - June 2013 | Medicare |
| GT | Sep. 2012 - June 2013 | TRICARE |
| JF | Sep. 2012 - June 2013 | TRICARE |
| KG | Sep. 2012 - June 2013 | Medicare |
| KY | 2011 - 2013 | TRICARE |
| LM | Sep. 2012 - June 2013 | Medicare |
| MH | Sep. 2012 - June 2013 | Medicare |
| MM | Sep. 2012 - June 2013 | TRICARE |
| MS | Sep. 2012 - June 2013 | TRICARE |
| PC | Sep. 2012 - June 2013 | Medicare |
| RT | Sep. 2012 - June 2013 | TRICARE |
| TM | 2012 - 2013 | Medicare |
| TS | Mar. 2010 - June 2013 | TRICARE |
| VC | Late 2012 - June 2013 | Medicare |
| VL | Sep. 2012 - June 2013 | TRICARE |

75.     This blatant abuse of billing for incident to services was instituted by and emanated from the highest levels of company management. During a training session held at National Spine's headquarters in early 2012, Gordon instructed Relator and other mid-level providers to bill all services that they provide under the name and NPI number of the ordering physician regardless of whether the ordering physician, another physician, or no physician is present in the office suite. In fact, since all of their services are billed under the name of the ordering physician, mid-level providers at National Spine do not even receive their own Medicare provider number.

76.     In or around the Fall of 2012, Claudine Maly ("Maly"), who worked in National Spine's billing department and was also its Chief Technology Officer, created a checkbox on the patient note form on National Spine's electronic medical record system (GE's Centricity software program) that enables mid-level providers to indicate whether a supervising physician was present in the office at the time the service was provided. To make it appear that the mid-level providers never rendered services without a supervising physician in the office, National Spine instructed the mid-level providers to always check the box stating that a supervising physician was present regardless of whether such a physician was present or not.

77.     On multiple occasions, including during corporate meetings, Relator and other mid-level providers voiced concerns to top management about the propriety of billing for a service under the name of a physician who did not directly supervise the service, but they were always instructed to bill under the name of the ordering physician.

78.     At the quarterly mid-level provider meeting for the fourth quarter of 2012 held at the Fairfax office, Gordon, Maly, and Human Resources Director, Mona Janke, acknowledged that services furnished by mid-level providers when no physician is present in the office suite do

not qualify as incident to services and are required to be billed under the name of the mid-level

provider. Yet, at the same meeting, Gordon and Janke also instructed the mid-level providers to

continue billing their services under the name of the ordering physician, pointing out that, if

National Spine started billing for the mid-level providers' services properly, then it would raise a

glaring red flag to the government that could lead to a complete review and audit of National

Spine's billing practices.

79.     On September 18, 2012, Relator raised concerns about National Spine's

fraudulent incident to services billing practice directly to Maly, stating that she was "having a

tough time" with billing Medicare at the physician's rate when the physician is not physically

present in the office "and at times not even in the state." Noting that she "sees lots of Medicare

patient[s]," Relator further complained that she usually sees Medicare patients before Wisor is in

the office or after he leaves the facility. Maly responded to Relator via an email dated September

19, 2012 in which she stated in pertinent part that:

> I totally understand. You are right if there is no doc in the suite then definitely no
> incident to for Medicare. I checked with Gordon and they are still working on the
> communication to make all of this clearer and who the PA's can have sign off on
> their notes when their main supervising physician is not there. There has been so
> much talk back and forth that I don't want to give you the wrong guidance so hold
> tight and do what you know at the moment. ...

Shortly after this interchange, Wisor admonished Relator and told her to stop sending emails

questioning National Spine's billing practices.

80.     Thereafter, during a meeting at the Fairfax office held on October 4, 2012 to

review Medicare billing, Relator and other mid-level providers, including, Deborah Nelson,

Emily Powell, Ericka Hoffmann, Laura Ricard, Maggie Ipsaro, and Jenifer Blanding, raised

concerns to Gordon and Maly that National Spine was billing the government for their services

as though the ordering physician furnished the services even though the ordering physician was

not present at the office and frequently no physician was present in the office at the time of the service. Gordon said that he would work with the office managers to ensure that a physician is always in the office when the mid-level providers are scheduled to see government healthcare program patients and that the physicians would be required to provide assistance to the mid-level providers when needed. With regard to how the services are billed, Gordon directed the mid-level providers to continue reporting that the ordering physician rendered the services.

81.     Since Wisor rarely worked at the Fredericksburg office, Relator also asked Gordon and Maly during the October 4, 2012 meeting if she could receive her own Medicare provider number and begin billing under her own name. Gordon and Maly told Relator that they recognize that she should have a Medicare provider number but that they would need the approval of the Board of Directors.

82.     The Board rejected Relator's request, stating that it would hurt the Fredericksburg office's revenue, as it would only receive 85% of the PFS for Relator's services instead of 100%, and it would also raise a red flag to the government if only one mid-level provider at the Company is billing for services under her name.

83.     Shortly after the October 4, 2012 meeting, National Spine did, in fact, begin scheduling mid-level providers to see patients covered by the government healthcare programs only on days when a physician was also going to be in the office. However, National Spine continued the practice of billing for all services furnished by the mid-level providers as though the ordering physicians rendered the services irrespective of whether the ordering physician was present in the office. Moreover, this change laid bare the perverse consequence of National Spine's practice of crediting only the ordering physician – not the supervising physician – for patient visits when determining whether revenue thresholds are satisfied and in calculating

bonuses. Other physicians are effectively dis-incentivized to assume any supervisory role when mid-level providers see patients because they receive no financial benefit from providing supervision; it only increases their workload while subtracting from the time they can spend seeing their own patients and meeting their own quotas.

**D.      National Spine's Fraudulent Schemes Related To Opioid Therapy**

**1.      National Spine fraudulently generates significant revenues by requiring opioid therapy patients to attend unnecessary and worthless monthly office visits**

84.      One of the primary treatment services that National Spine provides is opioid therapy for chronic low back or neck pain using narcotics such as oxycodone (e.g., OxyContin, Percocet, and Percodan), oxymorphone hydrochloride (e.g., Opana), hydromorphone (Dilaudid), morphine (e.g., MS Contin), and Fentanyl (e.g., Duragesic).

85.      Relator estimates that at least 75% of the opioid therapy patients that she treated while working at National Spine were insured by one of the government healthcare programs.

86.      The general standard of care for treatment of opioid therapy patients is to schedule office visits every 90 days. Before the Merger, Capitol Spine followed the standard of care and required that opioid therapy patients visit the office every 90 days.

87.      To be able to bill for more office visits and drug tests, which are discussed in more detail in Part V-D-3 below, National Spine requires that opioid therapy patients visit its office every month. Accordingly, National Spine typically only provides opioid therapy patients a 30-day supply of the prescribed opioid drug. To induce opioid therapy patients to attend monthly appointments, National Spine tells patients that they will be required to pay a $15 penalty if they seek a refill before an appointment.

88.     In or around April 2012, the office manager of the Fredericksburg office, Tanya Almaas, informed Relator that the Board wants all opioid therapy patients to visit the office each month. Wisor subsequently informed Relator that Sentinel directed National Spine to institute this monthly visit policy.

89.     Most monthly visits are essentially worthless because National Spine does not provide any treatment to the opioid therapy patients during the appointment. (*See* paragraph 92 below).

90.     When Medicare began refusing to pay for monthly visits for opioid therapy patients in or around February 2013 on medical necessity grounds, National Spine changed its policy for Medicare beneficiaries from requiring a visit every 30 days to every 90 days. However, National Spine continues to require that all other patients visit the office monthly, including patients insured by TRICARE, the Federal Employee Health Benefits Program, and the Federal Employees' Compensation Program.

91.     By requiring patients to attend monthly office visits, National Spine is not only defrauding the government healthcare programs, it is also defrauding those opioid therapy patients who must make a co-payment for each medically unnecessary office visit.

**2.      National Spine overcharges the government for opioid therapy patients' monthly office visits**

92.     During the routine opioid therapy patient's monthly office visit, a medical assistant performs a qualitative drug screening using a urine sample and then a mid-level provider ensures that the patient is not experiencing any issues before providing the patient a prescription for another 30-day supply of their prescribed opioid drug. Thus, during the vast majority of opioid therapy office visits, no treatment is rendered.

93.     Since no treatment is rendered, the decision-making component of these office visits are of low complexity and therefore National Spine should bill the evaluation and management (E&M) service provided during these visits under CPT Code 99213. To obtain higher reimbursements for the service, however, National Spine instructs mid-level providers to code the E&M service provided during the monthly visit as CPT Code 99214, which applies to cases that involve decisions of "moderate complexity." National Spine instructed all mid-level providers to up-code the monthly opioid therapy visits by billing them as CPT Code 99214. For instance, Wisor and other physicians instructed mid-level providers to code all E&M services as "moderate complexity" CPT Code 99214 during a special corporate meeting held on May 18, 2013 at the Fairview Park Marriott in Falls Church, Maryland. The Board of Directors attended this special meeting. After the meeting, Gordon also directed the mid-level providers to bill all of the monthly visits as CPT Code 99214.

94.     Thus, in addition to billing the government healthcare programs for unnecessary and worthless office visits for opioid therapy patients (two out of every three visits), National Spine also frequently overcharged the government for the services rendered during the opioid therapy office visits.

**3.     National Spine routinely fraudulently bills the government for drug tests that are medically unnecessary and often worthless**

### *Coverage of drug screening for opioid therapy patients*

95.     A physician prescribing narcotics to treat chronic pain may be able to better manage the patient if the physician knows whether the patient is consuming other medications or substances that could suggest the possibility of substance abuse or lead to drug-drug interactions. *See* Medicare Local Coverage Determination ("LCD") L35105. Drug screening can also help a

physician ensure that the patient is taking the prescribed medication and is not diverting the medication or providing it to others.

96.     A qualitative drug screen can be performed at the point of care to determine the presence or absence of certain drug classes in the body. The most common method of qualitative drug screening is to test a urine sample. Qualitative urine drug tests are simple to perform and allow for immediate test results that may assist in the immediate management of patients.

97.     Inasmuch as *qualitative* drug screens only detect the presence or absence of certain drug classes, a more sophisticated (and more costly) *quantitative* drug test can be performed when it is medically necessary for a provider to know what specific drug and/or the amount of a particular drug a patient has in their bloodstream.

98.     Because a quantitative test is more complex and requires specialized training, physicians normally send the urine sample to an outside laboratory such as Aegis Sciences Corporation, Millennium Health, or Meditech, to perform this more precise testing.

99.     As a prerequisite to coverage by the government healthcare programs, qualitative and quantitative drug screening must be reasonable and necessary for the treatment of the patient. *See* 42 U.S.C. § 1395y(a)(1)(A); accord 42 U.SC. § 1320c-5(a)(3); 42 C.F.R. § 1004.10(a); 32 C.F.R. §§ 199.4(a)(1)(i) & (g)(2).

100.     It follows that any physician who orders laboratory tests must maintain documentation of medical necessity in the beneficiary's medical record. *See* 42 C.F.R. § 410.32(d)(2)(i). Likewise, a laboratory that submits a claim for payment to the government for a drug test must maintain the documentation it received from the ordering physician and be able to show that its claim accurately reflected the information it received from the ordering physician. *See* 42 C.F.R. § 410.32(d)(2)(ii).

101.    Like other medical services, monitoring an opioid therapy patient's consumption of prescribed opioids and other substances must be individualized and based on the needs of each particular patient. Testing all patients for all drug classes during each office visit pursuant to a blanket order is not individualized treatment and is not reimbursable. Numerous Medicare Part B Medicare Administrative Contractors ("MAC") have issued Local Coverage Determinations ("LCD") making this clear. Significantly, these guidelines govern reimbursement for every state (and the District of Columbia) in which National Spine has an office:

(A)    The Part B MAC for New York as well as for Connecticut, Indiana, and Kentucky notified providers that, effective October 1, 2009, a qualitative drug screen is considered medically reasonable and necessary for the monitoring of patients receiving opioid therapy when "**illicit drug use is suspected.**" LCD L28145 (emphasis added). Effective July 1, 2011, this MAC revised its LCD so as to clarify that qualitative drug screening is considered medically reasonable and necessary in patients receiving opioid therapy where (i) "**illicit drug use, non-compliance or a significant pre-test probability of non-adherence to the prescribed drug regimen is suspected** and documented in the medical record," or (ii) the patients are "**at high risk for medication abuse due to psychiatric issues, …[patients] have engaged in aberrant drug-related behaviors, or who have a history of substance abuse.**" *Id.* (emphasis added). This MAC also directed that "[d]rugs or drug classes for which screening is performed should reflect **only those likely to be present, based on the patient's medical history or current clinical presentation,**" and that "[c]onfirmation of drug screens is **only indicated when the result of the [qualitative] drug screen is different than that suggested by the patient's medical history, clinical presentation or patient's own statement.**" *Id.* (emphasis added).

(B)    In June 2010, the Part B MAC for Florida, Puerto Rico, and the Virgin Islands, issued an LCD directing medical practitioners that qualitative drug testing for management of a patient receiving opioid therapy is considered medically reasonable and necessary when: (i) **"there is a significant pre-test probability of nonadherence to the prescribed drug regimen** as documented in the patient's medical record"; or (ii) **"this select population has a significant pretest probability of drug interactions and side effects."** LCD L30574 (emphasis added). In addition, this MAC specifically instructed that **"[r]outine screening performed as part of a physician's protocol for treatment" is not considered to be medically reasonable and necessary.** *Id.* (emphasis added). It also directed that **there is no screening benefit for routine urinalysis when performed on the same date as a qualitative drug screen** and thus such claim would not be reimbursed. *Id.* (emphasis added).

(C)    In November 2011, the Part B MAC for the District of Columbia, Maryland, and New Jersey as well as for Delaware and Pennsylvania notified providers that a qualitative drug test is deemed to be medically reasonable and necessary for opioid therapy patients where: (i) **"other illicit drug use is suspected, when there has been an acute change in physical or mental status ...",** or (ii) **"[t]o demonstrate abnormal findings, including the presence or absence of prescribed drugs, presence of nonprescribed substances, detection of illicit substances and adulterated urine samples."** LCD L32050 (emphasis added). This MAC further directed that **"[d]rugs or drug classes for which testing is performed should reflect only those likely to be present, based on the patient's medical history or current clinical presentation."** *Id.* (emphasis added).

(D)    In August 2012, the Part B MAC for Arkansas, Colorado, Louisiana, Mississippi, New Mexico, Oklahoma, and Texas directed that "[a] qualitative drug screen may

be medically reasonable and necessary for the monitoring of chronic pain patients on chronic

opioid therapy who are at **high risk or who have engaged in aberrant drug-related behavior.**"

L32666 (emphasis added). In addition, this MAC directed that "**[d]rugs or drug classes for**

**which screening is performed should reflect only those likely to be present, based on the**

**patient's medical history or current clinical presentation.**" *Id.* (emphasis added). It also

specifically directed that:

> Frequency of drug screening should be based on the risk of diversion or abuse.
> Each patient's condition and response to treatment must medically warrant the
> number of services reported for payment. ... **Medicare expects that patients will**
> **not routinely require the maximum allowable number of services.**

*Id.* (emphasis added). With regard to confirmatory drug screenings, the Part B MAC directed that

such a screening "is indicated **when the result of the [qualitative] drug screen is different**

**than that suggested by the patient's medical history, clinical presentation or patient's own**

**statement.**" *Id.* (emphasis added).

      (E)    In December 2014, the Part B MAC for Virginia and West Virginia as

well as North Carolina and South Carolina issued an LCD similarly directing that "[c]riteria to

establish medical necessity for drug testing must be based on **patient-specific elements**

identified during the clinical assessment, and documented by the clinician in the patient's

medical record ...." LCD L35105 (emphasis added). This MAC instructs that the risk of

addiction in opioid therapy patients is "considered equivalent to the risk in the general

population." *Id.* For opioid therapy patients, the MAC recommends that an initial baseline test

for multiple drug classes be performed followed by random drug tests at random intervals. *Id.*

(emphasis added). Unless otherwise medically justified, testing should be limited to "prescribed

medications, non-prescribed medications that may pose a safety risk if taken with prescribed

medications, and illicit substances based on patient history, clinical presentation, and/or

community usage," and the frequency of such testing should be based on a patient's level of risk

for abuse and diversion of the pain medications:

| Risk Group | Frequency of Random Testing |
|------------|----------------------------|
| Low Risk | 1-2 times every 12 months |
| Moderate Risk | 1-2 times every 6 months |
| High Risk | 1-3 times every 3 months |

*Id.* Thus, monthly testing would only be appropriate for patients who are identified as "high risk"

for abuse or diversion. Furthermore, this MAC specifically directed that **drug tests performed**

**under a "blanket order" will not be covered** and that **"[r]outine standing orders for all**

**patients in a physician's practice are not reasonable and necessary."** *Id.* (emphasis

added).With regard to quantitative drug testing, the MAC instructs that confirming a negative

qualitative test result is reasonable and necessary if:

  a. The result is inconsistent with a patient's self-report, presentation, medical
     history, or current prescribed medication plan (should be present in the
     sample);

  b. Following a review of clinical findings, the clinician suspects use of a
     substance that is inadequately detected or not detected by a [qualitative test];
     or

  c. To rule out an error as the cause of a negative [qualitative test] result.

*Id.* Definitive testing to confirm a positive qualitative test result is reasonable and necessary if

"the result is inconsistent with the expected result, a patient's self-report, presentation, medical

history, or current prescribed medication plan." *Id.*

    102.    The FEHBP plan managed by MHBP similarly directs that "[t]ests performed

pursuant to orders/requests for preselected tests or panels of tests applicable to multiple patients

are not covered."

    103.    Echoing the reimbursement requirements that the MACs have set forth, a group of

pain management physicians recommended the following "practical approach to administering

drug screening" in an oft-cited article published in the PAIN PHYSICIAN JOURNAL in the spring of 2011:

> ... [I]nclude baseline drug testing, if appropriate; initiation of opioid therapy and compliance monitoring within one to three months after baseline monitoring; and routine, random monitoring approximately every 6-12 months or so, with provision for monitoring for unexpected results, complaints, or behavior patterns.

*See* Paul J. Christo, MD, et al. Urine Drug Testing In Chronic Pain, PAIN PHYSICIAN JOURNAL Apr. 2011 at 134.

104.    As Andrea Treese Berlin of the HHS OIG observed, "routinely testing specimens for many different drugs is a red flag [for lack of medical necessity] because 'it would seem like it might be without regard to the patient's medical condition.'" Doctors Cash In On Drug Tests For Seniors, And Medicare Pays The Bill, WALL ST. J., Nov. 10, 2014 (http://www.wsj.com/articles/doctors-cash-in-on-drug-tests-for-seniors-and-medicare-pays-the-bill-1415676782).

***National Spine has a blanket order requiring that each opioid therapy patient receive a qualitative drug test for numerous drug classes during each office visit and also that every patient's urine sample be sent to an outside lab for confirmatory quantitative testing***

105.    National Spine routinely administers unnecessary qualitative drug tests and orders unnecessary quantitative testing by an outside lab for every opioid therapy patient during each office visit.

106.    Each time an opioid therapy patient requires a refill of their pain medication National Spine requires that its medical assistants administer a twelve panel qualitative drug screening that typically covers the following drug classes:

- Alcohol
- Amphetamines
- Barbiturates
- Benzodiazepines
- Cocaine
- Heroin
- MDMA (ecstasy/Molly)
- Methadone
- Methaqualone
- Opiates
- PCP
- THC (marijuana)

107.    In accordance with National Spine's blanket order, when an opioid therapy patient arrives for their visit, a medical assistant requires the patient to urinate into a test cup that contains color-coded test strips. Within minutes of the patient's urine contacting the strips, colored lines appear indicating either a positive or negative result for each of the drug classes tested.

108.    The Fredericksburg office is the training office for National Spine's medical assistants. Relator witnessed the office manager and medical assistants at Fredericksburg train medical assistants from several other offices to collect a urine sample from every opioid therapy patient during each visit and then perform a qualitative twelve panel test on each sample and send each sample to an outside lab for quantitative testing.

109.    National Spine included the following standard language in opioid therapy patients' charts:

> Qualitative Urine Drug Screen
> Indication
> Urine drug testing was performed today as part of a monitored opioid treatment program for chronic pain. The patient signed an opioid contract prior to initiating treatment, which requires **random urine drug testing** to ensure compliance. The test determines the presence or absence of prescribed drugs or of nonprescribed substances, and detects illicit substances and adulterated urine samples. … (Emphasis added).
>
> Method
> The patient provided a urine sample on-site. The sample will be securely transported to our central qualitative laboratory for immunoassay analysis, The drugs to be tested include: amphetamine, barbiturate, benzodiazepine, cocaine, ecstasy, methadone, methaqualone, opiate, PCP, heroin, alcohol, and THC.

110.    Although the disclosure claims that National Spine will conduct "random urine drug testing," National Spine actually tests patients during each visit for numerous drug classes in order to maximize its revenue.

39

111.    Performing a twelve panel qualitative drug test on all patients during each office visit without regard for their individual medical conditions is medically unnecessary.

112.    This is especially true where, as is the case at National Spine, the patient populations carry a lower risk of abuse or diversion of opioids. A large percentage of National Spine's opioid therapy patients are either working class adults, who are already subject to drug testing by their employers, or retirees.[5] Moreover, National Spine only treats adults.

113.    In addition to being unnecessary, the twelve panel qualitative drug test is, in some respects, worthless because patients may also drink alcohol or take drugs, such as amphetamines, barbiturates, or benzodiazepines, that normally have no impact on the opioid therapy treatment plans set by National Spine's physicians. Similarly, many National Spine physicians will continue to prescribe opioids to patients who test positive for THC or marijuana.

114.    And while a positive test result for cocaine, MDMA, heroin, or methadone could cause National Spine's physicians to refuse to continue a patient's opioid therapy, from Relator's experience, a positive test result for these illicit substances was extremely rare. Relator witnessed positive tests for cocaine on only two occasions, and she never saw a single patient test positive for MDMA. Moreover, with regard to methadone, which is used to treat an existing addiction to heroin, Relator only witnessed two patients test positive for methadone, and, in both cases, the physician was already aware that the patient was taking methadone to treat a heroin addiction. Relator estimates that although approximately 400 opioid therapy patients were treated at National Spine's Fredericksburg office each month, during the more than three years that she

---

[5] According to a 2012 survey by the federal Substance Abuse and Mental Health Services Administration, only about one of 1,000 seniors (0.1%) abuse or are addicted to illicit drugs, including marijuana. *See* Doctors Cash In On Drug Tests For Seniors, And Medicare Pays The Bill, Wall St. J., Nov. 10, 2014 (http://www.wsj.com/articles/doctors-cash-in-on-drug-tests-for-seniors-and-medicare-pays-the-bill-1415676782).

worked at the Fredericksburg office there were only two instances of patients attempting to divert medication. Similarly, it was highly unusual for patients to exhibit aberrant behavior, such as withdrawal symptoms or suspicious requests for refills, according to Relator.

115.    After the Merger, Wisor informed all providers and office managers via an email that Sentinel directed National Spine to perform the twelve panel qualitative drug screening on all opioid therapy patients each office visit. Indeed, Wisor characterized the mandatory, repeated drug screenings as "low hanging fruit" because they are a guaranteed way to generate revenue for National Spine and cash bonuses for employees.

116.    Making matters worse, National Spine additionally requires that its medical practitioners also order confirmatory quantitative drug testing for every opioid therapy patient during each office visit. Thus, during each opioid therapy patient visit, after performing the twelve panel qualitative drug screening, the medical assistant transfers the patient's urine sample into a sealable cup and sends it to an outside lab to re-test for the same drug classes that National Spine already tested for as well as nicotine. And so, National Spine even re-tests for drug classes that the patient did not report taking and for which the in-office qualitative test result was negative. On information and belief, National Spine bills the government for collecting the sample that it sends for quantitative testing.

117.    In addition to being duplicative, the quantitative tests are medically unnecessary and, in some cases, worthless for all the same reasons that the regular, blanket qualitative drug tests are medically unnecessary. The nicotine tests are entirely worthless because nicotine consumption does not affect the patient's treatment plan. Furthermore, here again, National Spine even tests patients who acknowledge that they are smokers.

41

118.    As confirmed by the LCDs, indiscriminate drug screenings that are performed pursuant to a blanket order on every opioid therapy patient during each office visit are not medically reasonable and necessary.

119.    In fact, National Spine prescribes, and in many cases also dispenses, another month's supply of the opioid to the patient during the office visit and before receiving the report from the outside lab regarding the results of the drug tests (National Spine typically does not receive the result of the urinalysis until one to two days after the test). This evidences that the urinalysis results are not being utilized to manage the patient's opioid therapy and instead are administered solely to generate revenue. According to the Relator, National Spine's physicians never even review the results of the urinalysis. And, inasmuch as National Spine did not train mid-level providers on how to read the test result reports that the outside lab provided, the test results were meaningless to the mid-level providers.

120.    To falsely create the appearance that it only orders quantitative drug testing when it is medically necessary, National Spine includes the following language in patients' medical charts:

> Quantitative confirmation may be indicated when the result of the qualitative test
> is different than that suggested by the patient's medical history, clinical
> presentation, or patient's own statement or there is a positive inconsistent findings
> [sic] from the previously performed qualitative test.

121.    Relator estimates that the Fredericksburg office alone administered approximately 400 in-house twelve panel qualitative drug screenings and ordered 400 duplicative quantitative drug tests per month.

122.    From in or around March 2012 to early 2013, National Spine required that all quantitative drug test orders be sent to Millennium Health.[6] In early 2013, National Spine began requiring that all quantitative drug test orders be sent to Aegis Sciences. Indeed, Aegis Sciences leased a small space within the National Spine offices where it collected urine samples and sent them to its off-site laboratory for testing. In July 2013, National Spine ceased using Aegis Sciences and began sending all quantitative drug test orders exclusively to Meditech, which is also the exclusive supplier of orthopedic braces to National Spine's patients.

123.    The outside laboratory that performs the unnecessary quantitative and/or confirmatory testing bills the government healthcare programs for these tests. The government's cost for these tests can be as much as $1,800.[7] Defendants caused the submission of these expensive bills for unnecessary and worthless drug tests.

124.    To monitor the various offices' compliance with its testing requirements, National Spine tracks how many in-house qualitative tests are administered by each office, each day. It also tracks how many off-site quantitative tests each office orders each day.

125.    If an office fails to administer a drug test to every opioid therapy patient who visits the office, National Spine's corporate management instructs the office manager to ensure that all medical assistants administer drug tests for all opioid therapy patients on each visit. In addition, National Spine's Director of Human Resources, Mona Janke, met with office managers each month to review the office's drug testing volume.

---

[6] The U.S. Department of Justice has accused Millennium Health of billing Medicare for unnecessary drug tests. On June 14, 2015, the Wall Street Journal reported that Millennium Health was negotiating a settlement with the government under which it would be required to pay approximately $250 million to the government. *See* Lab Nears Settlement Over Pricey Medicare Drug Tests, WALL ST. J., June 14, 2015 (http://www.wsj.com/articles/lab-nears-settlementover-pricey-medicare-drug-tests-1434326131).

[7] When insurers refuse to pay the outside laboratory's bill, the lab bills the patients. Some patients pay the bill, while others ignore it.

126.   National Spine rewards the office that administers the highest volume of drug tests each week with gift cards, cash prizes, and free meals at restaurants.

127.   To incentivize offices to perform qualitative and quantitative drug tests on every patient, National Spine considers drug testing volume and sample collection rates in determining the amount of employee bonuses. If an office fails to collect urine samples from each opioid therapy patient, National Spine penalizes the employees by withholding bonuses from that office. In addition, the office manager reprimands the staff. When the Fredericksburg office had a 60% collection rate in the fall of 2012, National Spine withheld bonuses from the office manager and medical assistants.

128.   Examples of government healthcare program beneficiaries who underwent unnecessary drug tests during office visits that occurred between March and June 2013 at the Fredericksburg office include:

| Patient | Insurer |
|---------|---------|
| AJ | Medicare |
| AN | Medicare |
| AS | Medicare |
| CF | Medicare |
| CH | Medicare |
| CS | Medicare |
| SE | Medicare |

129.   It should be noted that, unless a patient requests Wisor to taper the dosage of their opioid, he will keep them on the full dosage so they will continue coming back to the office for re-fills and drug tests.

### *Capitol Spine had a similar blanket order under which employees administered unnecessary qualitative drug tests on every opioid therapy patient during each office visit*

130.   Before the Merger, Capitol Spine performed a four panel qualitative drug screening on every opioid therapy patient during each office visit. Capitol Spine always tested for amphetamines, cocaine, opioids, and THC.

44

131.    Capitol Spine also ordered a twelve panel quantitative test from Meditech for every patient during each office visit.

132.    This corporate-wide policy was in place when Relator joined Capitol Spine in March 2010.

**E.    National Spine Fraudulently Bills The Government For Ultrasounds That Are Both Medically Unnecessary And Worthless And Are Often Not Even Actually Performed**

133.    National Spine treats a significant number of patients who experience back or neck pain or pain in their hips, knees, or other joints with anesthetic and/or steroid injections.

134.    When performing certain injections in the back or neck physicians frequently utilize fluoroscopic[8] guidance to ensure proper placement of the needle and accurate delivery of medication to the joint area.

135.    Only trained and certified physicians, qualified medical physicists, registered radiologist assistants, radiologic technologists, and radiation therapists are permitted to perform fluoroscopy.

136.    Consequently, at National Spine physicians perform all pain injections that require fluoroscopic guidance, such as back and neck injections, and mid-level providers usually perform the injections that do not require fluoroscopic guidance, including knee, hip, ankle, finger, thumb, and wrist injections.

137.    In or around the summer of 2012, Medicare stopped reimbursing for fluoroscopic guidance performed in conjunction with sacroiliac (SI) joint injections because the guidance was not medically necessary. To avoid the resultant drop off in revenue caused by this change, National Spine instructed physicians to perform ultrasonic guidance for SI injections.

---

[8] Fluoroscopy is a type of medical imaging that shows a continuous x-ray image on a monitor, much like an x-ray movie.

138.    Starting in or around the Fall of 2012, to compensate for the loss of revenue caused by Medicare's refusal to pay for fluoroscopic guidance in connection with SI injections and to increase its profitability on other injections, National Spine instituted a policy requiring that physicians and mid-level providers bill for ultrasound guidance on every joint injection where the government healthcare programs will not cover fluoroscopy.[9]

139.    At all relevant times, the reimbursement amount for ultrasound guidance for needle placement (CPT Code 76942) has been approximately $207. For each ultrasonic guidance performed the provider must add to patient's medical record images of the site to be localized as well as a documented description of the localization process.

140.    To qualify for coverage by the government healthcare programs, ultrasonic guidance must be medically reasonable and necessary for proper needle placement.

141.    The government has specifically directed that ultrasound guidance will not be covered if administered in connection with certain injections. For example, the Part B MAC for Florida directs that ultrasounds will not be covered for knee injections:

> Imaging procedures performed routinely for the purpose of visualization of the knee to provide guidance for needle placement will not be covered. Fluoroscopy may be medically necessary and allowed if documentation supports that the presentation of the patient's affected knee on the day of the procedure makes needle insertion problematic. **No other imaging modality for the purpose of needle guidance and placement will be covered.**

LCD L29307 (emphasis added).

142.    In mid-2012, before the ultrasound policy was instituted, Wisor, who at the time was National Spine's President, sent Relator to National Spine's office in Bel Air, Maryland, to learn how Dr. Jeffrey Schneider integrates ultrasounds into his pain management practice. Dr.

---

[9] There are no certification or credentialing requirements for physicians or mid-level providers to perform a non-diagnostic ultrasound, including for needle placement.

Schneider was one of only a few National Spine physicians who was formally trained on performing ultrasonic guidance and regularly utilized ultrasonic guidance in performing joint injections.

143.    Thereafter, Wisor held a meeting with all National Spine physicians advising them to incorporate ultrasounds into their practices as another way of increasing revenue. Wisor placed Gordon in charge of developing a corporate policy requiring that an ultrasound be performed with every joint injection in which fluoroscopic guidance would not be eligible for coverage. Gordon in turn tasked Relator, Dr. Baljinde Brar, and Dr. Joshua Thomas with implementing the policy at the offices located in Northern Virginia.

144.    In connection with this new corporate policy, Sentinel purchased an ultrasound machine for each National Spine office. That National Spine's and Sentinel's objective in instituting the ultrasound policy was to generate more revenue from injection procedures is demonstrated by (i) the shoddy quality of the suspiciously low-priced ultrasound equipment purchased for and used by each office; and (ii) the lack of training National Spine provided to physicians and mid-level providers regarding ultrasonic guidance.

145.    National Spine and Sentinel equipped each office with a laptop ultrasound scanner manufactured by Wuhan Tianyi Electronic Co., Ltd. of China. A picture of the laptop ultrasound scanner can be viewed on the next page.

47



146.    Wisor directed National Spine's Facilities Manager, Kevin Gartland, to purchase

the cheapest ultrasound machine available because he was concerned that the government

healthcare programs and other insurers may soon stop reimbursing for ultrasound needle

guidance in which case National Spine would have no use for the equipment. In accordance with

Wisor's instruction, Gartland purchased the Wuhan Tianyi Electronic laptop ultrasound scanner

for $700 per scanner from Rising Medical Co., Ltd.[10]

147.    Sentinel paid for the ultrasound equipment. In general, National Spine offices are

required to obtain Sentinel's approval before incurring any material costs.

---

[10] The cost of an ultrasound machine of average quality is approximately $35,000.

148. The image quality of the Wuhan Tianyi Electronic laptop ultrasound scanner is of such poor quality that physicians and mid-level providers could not even see the needle on the screen.

149. Accordingly, National Spine's providers did not use the ultrasound for needle guidance. In accordance with National Spine's directives, however, the providers reported utilizing ultrasonic guidance and billed for it. And, National Spine instructed the providers to take a picture of the ultrasound probe next to the joint and create a false patient note so that, in the event that the government audits the false bills, it will appear as though National Spine really utilized ultrasonic guidance for the injections.

150. Moreover, even if the needle could be seen on the low-quality laptop ultrasound scanners, National Spine did not want to incur the cost of properly training the physicians and mid-level providers on how to use ultrasounds for needle guidance. National Spine refused to pay for training and directed that any training should not conflict with employee work schedules.

151. After Relator and other mid-level providers insisted that they receive training, Wisor and Friedlis required that all physician assistants attend a mandatory ultrasound training session with Dr. Schneider in January 2013 at the Fairfax office. Those who attended the meeting included Gordon as well as Drs. Brar, Robinson, Davis, Kim, Badiola, Balint, Sloan, Whittenberg, Kenneith, and Davine, and physician assistants Deborah Nelson, Valerie Holznech, Laura Ricard, and Jennifer Slating. Tellingly, during the training session, Dr. Schneider used a much higher quality machine than the worthless machine Sentinel put in the other offices.

152. To incentivize providers to report using ultrasonic guidance for joint injections, National Spine included ultrasonic guidance revenue as one of the factors that determined the amount of their bonus. (*See* paragraphs 49 & 50 above).

153.    Relator shared the ultrasound machine in the Fredericksburg office with Dr. Costa Soteropoulos. Dr. Soteropoulos told Relator that he was required to report performing a set number of injections with ultrasonic guidance each day to be eligible for a bonus.

154.    At the time that Relator ceased working for National Spine in June 2013, physicians and mid-level providers were performing unnecessary ultrasonic guidance with every injection or else billing for ultrasonic guidance even though they did not – and indeed could not – perform ultrasonic guidance.

155.    Examples of beneficiaries of the government healthcare programs who purportedly received ultrasonic guidance between August and September 2012 that was billed under Wisor's name include:

| Patient | Insurer |
|---------|---------|
| RB | Medicare |
| CC | Medicare |
| CL | Medicare |
| HT | Medicare |
| TS | Medicare |
| TS | Medicare |

## F.    National Spine Prescribes Orthopedic Braces To Patients Regardless Of Need Or Proper Fit

156.    In spite of the fact that the government healthcare programs only cover items that are "reasonable and necessary for the diagnosis or treatment of illness or injury," 42 U.S.C. § 1395y(a)(1)(A), National Spine requires practitioners to prescribe orthopedic braces, most predominantly back and knee braces, as they are the most expensive, to all patients with back, neck or joint pain regardless of whether the patients need, or will benefit from, a brace.

157.    National Spine trained practitioners, including Relator, to "sell" the braces to the patients by telling them that the government healthcare programs will cover most of the cost of the braces. National Spine collected any deductibles or co-pays for the braces.

158.    National Spine orders all orthopedic braces from Meditech, LLC, whose principal place of business is 6820 Hospital Drive, Suite 302, Rosedale, Maryland 21237, which is the same address as National Spine's "White Marsh" office.

159.    From August 2012 to February 2013, Meditech rented space within National Spine offices and placed a representative in the offices to fit patients for the orthopedic braces and process the orders. After Meditech and National Spine ceased this practice, National Spine's medical assistants or mid-level providers became responsible for fitting patients for the braces. However, National Spine never trained the medical assistants and mid-level providers on proper brace selection or properly fitting braces. As a result, patients frequently return the brace to National Spine, complaining that it did not fit correctly or oftentimes that it worsened their pain.

160.    National Spine incentivized providers to sell the braces by making sales volume a factor in how bonuses are calculated. (*See* paragraphs 49 & 50 above).

161.    Before the Merger, Friedlis sent a weekly email to all Capitol Spine physicians and mid-level providers directing them to sell more braces. These weekly emails also ranked physicians according to the number of braces they and their mid-level providers sold during the prior week. National Spine likewise tracked how many fittings medical assistants and mid-level providers performed.

162.    After the Merger, National Spine provided office managers with a monthly orthopedic brace sales report that was broken down by office, physician, and mid-level providers. Office managers would then review and discuss the results with the providers.

163.    Similarly, Wisor maintained a spreadsheet on his office computer that he used to show other physicians how they could generate more revenue. With respect to orthopedic braces,

the spreadsheet stated that each back brace generates $900 to $1,100 in revenue. The spreadsheet also tracked how many orthopedic braces each office sold.

164. When a mid-level provider prescribed an orthopedic brace, National Spine billed for it as though the patient's physician prescribed the brace. But, because so many braces were being billed under physicians' names, National Spine later switched to billing for the braces under each office's Medicare number in order to conceal the scheme from the government.

165. Defendants caused Meditech to submit claims to the government healthcare programs for the unnecessary and often worthless back braces.

166. Examples of beneficiaries of the government healthcare programs to whom National Spine prescribed an unnecessary and/or worthless back brace include:

| Patient | Approximate Date | Insurer |
|---|---|---|
| EN | Aug. 13, 2012 | TRICARE |
| NT | Sep. 10, 2012 | Medicare |

## G.   Schedule II Narcotics Were Routinely Illegally Dispensed From The In-House Pharmacy At The Fredericksburg Office

167. In early to mid-2012, National Spine opened an in-house pharmacy at the Fredericksburg office so that it could dispense opioids, which are Schedule II controlled substances[11], to workers' compensation patients, including patients covered by the Federal Employees' Compensation Program.[12]

168. From mid-2012 until early 2013, Wisor was the only physician at the Fredericksburg office who was licensed by the Virginia Board of Pharmacy to sell controlled

---

[11] Schedule II substances have a high potential for abuse with severe psychological or physical dependence.

[12] National Spine also opened an in-house pharmacy at the Glen Allen office around that same time as it opened the pharmacy at the Fredericksburg office. It already had in-house pharmacies at several other offices.

substances. In early 2013, Drs. Christopher Gay and Costa Soteropoulos also obtained licenses to sell controlled substances at the Fredericksburg office.

169. Under Virginia law, Drs. Wisor, Gay, and Soteropoulus were personally responsible for the selection, preparation, packaging, and dispensing of drugs from the Fredericksburg office. *See* 18 Va. Admin. Code § 110-30-40(A). Before dispensing any medication from the pharmacy, Drs. Wisor, Gay, and Soteropoulus were also required to:

1. Conduct a prospective drug review and offer to counsel a patient in accordance with provisions of § 54.1-3319 of the Code of Virginia; and

2. Inspect the prescription product to verify its accuracy in all respects, and place his initials on the record of sale as certification of the accuracy of, and the responsibility for, the entire transaction.

18 Va. Admin. Code § 110-30-40(B)[13]; accord Va. Code Ann. § 54.1-3319.

170. Additionally, inasmuch as National Spine did not employ a registered pharmacy technician or a nurse or physician assistant trained in pharmacy technician tasks, no one other than Drs. Wisor, Gay, and Soteropoulus were allowed to be present in the controlled substances selling and storage area within the Fredericksburg office. *See* 18 Va. Admin. Code § 110-30-40(A). Similarly, no one other than Drs. Wisor, Gay, and Soteropoulus could have the keys or alarm code for the selling and storage area. *See* 18 Va. Admin. Code § 110-30-130(A).

171. In violation of Virginia law, Drs. Wisor, Gay, and Soteropoulus routinely allowed office manager Tanya Almaas and medical assistant Sara Sparks, neither of whom were certified pharmacy technicians, to be present in the controlled substances storage and selling areas as well as to prepare and dispense opioids and other narcotics from the pharmacy. *See* Va. Code Ann. §§ 54.1-3320, 3321(A). In fact, the physicians gave Ms. Almaas and Ms. Sparks keys to the

---

[13] If the record of sale is maintained in an automated data processing system, the licensee shall personally place their initials with each entry of a sale as a certification of the accuracy of, and the responsibility for, the entire transaction. 18 Va. Admin. Code § 110-30-40(C).

controlled substance storage and selling area as well as the access code to disable the alarm on the medicine closet and allowed them to function as licensed pharmacists.

172.    In addition, on most days, Ms. Almaas or Ms. Sparks opened and closed the pharmacy in the Fredericksburg office as well as inventoried the medicine supply. On many of these days, no physician was present in the office. The various reports required under Virginia and federal law (*see, e.g.*, Va. Code Ann. § 54.1-3404; 18 Va. Admin. Code § 110-30-180; and 21 C.F.R. §§ 1304.21 & .22(c)), that the pharmacy used to record the inventory as well as the receipt, sale, and dispensing of controlled substances, were falsified to make it appear as though Wisor prepared the reports and managed the pharmacy. On numerous occasions, Relator witnessed Ms. Sparks complete the required reports before providing them to Wisor who would sign them despite having no knowledge of their accuracy. When Wisor was out of the office, he signed the reports after he returned.

173.    In addition to the significant risk of harm to patients, Wisor's disregard of Virginia's rules and regulations for in-house dispensing of controlled substances, substantially increased the potential for diversion and jeopardized the public's health and safety.

174.    Relator expressed concerns to Wisor and Ms. Almaas about the illegal dispensing of opioids from the pharmacy, but the practice continued. In March 2013, Wisor instructed Relator to "stay in your lane and let Tanya [Almaas] deal with the dispensing issue."

175.    Moreover, for all drugs that Relator ordered to be dispensed by the Fredericksburg pharmacy, Wisor directed Relator to leave the prescription in his inbox. He would later sign the prescriptions to make it appear as though he prescribed the medications. When he was out of the office, Wisor signed the prescriptions after he returned. In fact, the

Fredericksburg office's pharmacy routinely dispensed medications to Wisor's patients while he was out of the office. (*See* paragraphs 67-72 above).

176.    In addition, in violation of 18 Va. Admin. Code § 110-30-170, National Spine failed to inform workers' compensation patients that they have the right to choose where they have their prescription filled – *i.e.,* at an independent pharmacy or at National Spine's pharmacy.[14]

177.    If the government healthcare programs had been aware that the opioids and other controlled substances that the beneficiaries received from the Fredericksburg office were dispensed illegally, they would have denied the requests for payment for the medications.

## H.    National Spine Performs Medically Unnecessary Spinal Cord Stimulator Trials On Patients Who Are Poor Candidates For Permanent Therapy

178.    Spinal cord stimulation ("SCS") is a treatment for chronic pain that uses a mild electric shock current to block nerve impulses in the spine. Medicare will cover SCS for relief of chronic intractable pain. SCS therapy consists of a short trial with a percutaneous implantation of neurostimulator electrode(s) in the epidural space for assessing the patient's suitability for ongoing treatment with a permanent surgically implanted nerve stimulator.

179.    The Medicare Part B MAC for Virginia provides the following directives with regard to SCS therapy:

Selection of patients for implantation of spinal cord stimulators is critical to success of this therapy. SCS therapy should be considered as a late (if not last) resort after more conservative attempts such as medications, physical therapy, surgery, psychological therapy or other modalities have been tried.

Patients must have undergone careful screening, evaluation and diagnosis by a multidisciplinary team prior to implantation. (Such screening must include psychological,

---

[14] National Spine also directed providers to make drug selection decisions based on the inventory levels in the office pharmacy.

as well as physical evaluation). Documentation of the history and careful screening must be available in the patient chart if requested. Patients being selected for a trial
- Must not have active substance abuse issues.
- Must undergo proper patient education, discussion, and disclosure including an extensive discussion of the risks and benefits of this therapy.
- Must undergo appropriate psychological screening.

***

It is expected that accurate patient selection will lead to most patients going on to receive permanent implants. Only patients who experience a positive response to a trial should proceed to a permanent implantation. All trials which proceed to permanent implant must have adequate documentation in the chart to support that decision. A successful trial should be associated with at least a 50% reduction of target pain, or 50% reduction of analgesic medications, and show some element of functional improvement. (Patients with reflex sympathetic dystrophy may show lower levels of improvement since it takes longer periods for improvement than the typical 1-2 week trial). Physician judgment and experience will also be taken into account.

LCD L32549.

180.   A psychological screening is a prerequisite to coverage because psychological factors such as somatization, depression, anxiety, and poor coping are predictors of a poor outcome following SCS.

181.   National Spine performs all psychological evaluations by administering the Battery for Health Improvement 2 (BHI2) via a computer program in the office rather than referring the patient to a psychologist or psychiatrist. Before the Merger, Capitol Spine similarly performed psychological evaluations via a computerized test.

182.   St. Jude Medical, who manufactures SCS devices, recommended to Wisor that National Spine discontinue its practice of performing the psychological evaluation internally and to instead have an independent psychologist or psychiatrist perform the evaluations. National Spine chose not to follow St. Jude's recommendation.

183.   National Spine lowers the standards on the computer test thereby expanding the pool of patients who can receive the costly SCS trial. As Gordon expressed in a September 10,

2010 email to all physicians and physician assistants at Capitol Spine, "[t]he goal is to avoid using a psych code, which may come back to haunt us when we try to get reimbursed for the trial."

184.    As a result, National Spine implants a trial SCS in many patients who are not appropriate candidates for SCS therapy. The low success rate of the SCS trials, coupled with the fact that only a small percentage of patients ultimately receive a permanent implant, evidences that National Spine performs these trials on patients who are unlikely to continue the therapy.

185.    Notably, Wisor implanted an SCS device in approximately 30 patients per month, including at times for indications for which SCS devices are not approved by the FDA. Relator estimates that more than half of these patients were beneficiaries of one of the government healthcare programs. In contrast, other National Spine physicians were implanting spinal stimulators in only approximately two to three patients per month. National Spine's Board was concerned that Wisor's high volume of SCS procedures was going to lead to a government audit.

I.    **National Spine Fraudulently Billed The Government For Unnecessary Radiofrequency Ablation Procedures**

186.    Radiofrequency Ablation (a/k/a radiofrequency neurotomy, facet rhyzotomy, or lesioning) ("RFA") is a treatment for chronic spinal joint pain that involves generating heat with a radio wave and applying that heat to a spinal sensory nerve. The treatment, which is applied with a needle-like tube that punctures the skin, is intended to create a lesion in a spinal sensory nerve in order to interrupt the transmission of pain signals from spinal sensory nerves to the brain. *See* Medical Policy, Radiofrequency Ablation for Chronic Spinal Pain, UCARE CLINICAL & QUALITY MANAG., Jan. 1, 2015 *available at* https://www.ucare.org/providers/Resources-Training/Medical-Policy/Documents/Radiofrequency%20Ablation%20for%20Chronic - %20Spinal%20Pain.pdf.

187.    RFAs were a significant source of revenue for National Spine and Capitol Spine. From March 2010 until late 2011, Relator observed Wisor perform, on average, about ten RFA procedures per week. But Relator routinely witnessed behavior by Wisor during the RFA procedure that appeared calculated to drive revenue rather than treat a medical condition. For every patient that was scheduled to have an RFA procedure performed on a spinal "level" location, Wisor would treat an additional level. For instance, if a patient was scheduled for an RFA level 3, Wisor would treat both levels 3 *and* 4 while the patient was on the operating table. For almost every RFA patient Relator observed, an extra "level" was treated and presumably billed to government healthcare programs by Capitol Spine and National Spine. In other words, additional levels were treated with RFA without first assessing whether the initial level had effective results.

188.    According to National Spine's website, RFA is "usually effective after one treatment" and may be repeated annually or every six months. *Id.* However, according to Relator, the RFAs performed at National Spine were not usually effective after one treatment. Rather, almost all patients Relator observed who received RFA treatment came back for at least a second RFA treatment. A significant percentage – Relator estimates 30% to 40% of the patients she saw – came back for two additional RFA procedures.

189.    In late 2011, the government healthcare programs began denying several claims for reimbursement for RFA procedures submitted by National Spine based on one or more of the following grounds:

- The physician failed to perform a medial branch block before performing the RFA[15];

---

[15] The government healthcare programs require that a medial branch block procedure be performed on all patients before an RFA procedure. The medial branch block procedure determined whether a patient would benefit from an RFA procedure.

58

- The physician was repeating the RFA despite poor results with previous procedures;

- The physician failed to wait the requisite amount of time between procedures; or

- The physician performed the RFA without submitting a letter of medical necessity.

190.    As a result, National Spine did not seek payment for many RFA procedures, as it knew they could not be justified as being medically necessary.

191.    Shortly thereafter, during the Thursday meetings, Wisor instructed National Spine's physicians that they need to document medical necessity for each "level" treated in an RFA procedure. Similarly, Gordon gave the same instruction to the mid-level providers during their meetings. National Spine also made an RFA billing guide available to the providers.

192.    Through company meetings, including a May 2013 meeting focused on billing and compliance, as well as corporate-wide emails, it was apparent to Relator that National Spine continued being aggressive in performing RFA procedures even after the government started scrutinizing its RFA claims more closely.

## J.    National Spine Fraudulently Bills The Government For Unnecessary Pain Injections

193.    Under pressure to generate revenue, providers frequently administer pain injections to patients who do not need them. Oftentimes it will be noted that the patient reported feeling a pain level of zero or one (very low) or that the patient experienced no relief from a prior injection but yet the provider administers another injection to the patient to generate revenue.

## VI. COUNTS

### COUNT I
### FEDERAL FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3729(a)(1)(A)

194.    Relator hereby incorporates and re-alleges paragraphs 1 through 193 as though fully set forth herein.

195.   Defendants NSPC, CFPM, Capitol Spine, NSPC Holdings, Manhattan Spine, and New York Spine, by and through their agents, officers, employees, and principal owners, including defendants Sentinel, Dey, Fabian, Friedlis, Gordon, Lobel, Loev, Murphy, Wisor, and Zuckerman, have violated 31 U.S.C. § 3729(a)(1)(A) by engaging in the following fraudulent schemes, among others, that are alleged herein:

(a)   knowingly presenting or causing to be presented false or fraudulent claims to the government healthcare programs for payment for services furnished by mid-level providers as though the services were provided by the ordering physician even though the services did not qualify as incident to services;

(b)   knowingly presenting or causing to be presented false or fraudulent claims to the government healthcare programs for payment for evaluation and management services furnished to opioid therapy patients that were both medically unnecessary and worthless;

(c)   knowingly presenting or causing to be presented false or fraudulent claims to the government healthcare programs for payment for evaluation and management services furnished to opioid therapy patients that were falsely characterized as involving "moderate complexity";

(d)   knowingly presenting or causing to be presented false or fraudulent claims to the government healthcare programs for payment for qualitative and quantitative drug tests that were both medically unnecessary and worthless;

(e)   knowingly presenting or causing to be presented false or fraudulent claims to the government healthcare programs for payment for ultrasounds that were both medically unnecessary and worthless and often not even actually performed;

      (f)     knowingly presenting or causing to be presented false or fraudulent claims to the government healthcare programs for payment for orthopedic braces the were medically unnecessary and/or worthless; and

      (g)     knowingly presenting or causing to be presented false or fraudulent claims to the government healthcare programs for payment for Schedule II narcotics that were illegally dispensed from the Fredericksburg, Virginia office.

In connection with all of the false and fraudulent claims submitted on Form CMS-1500, NSPC, CFPM, Capitol Spine, NSPC Holdings, Manhattan Spine, and/or New York Spine, by and through their agents, officers, employees, and principal owners, including defendants Sentinel, Dey, Fabian, Friedlis, Gordon, Lobel, Loev, Murphy, Wisor, and Zuckerman, knowingly made the following false certification:

> In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reported in the designated section. For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills.

Similarly, in presenting all of the alleged false and fraudulent claims, or causing the claims to be presented, the Defendants have also impliedly certified that all prerequisites for coverage and payment were met.

196.    In engaging in the conduct alleged above, the Defendants acted "knowingly" as that term is defined in 31 U.S.C. § 3729(b)(1), in that they acted with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information.

197.    The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial and is therefore entitled to treble damages under the FCA plus a civil penalty of $5,500 to $11,000 for each violation.

**COUNT II**
**FEDERAL FALSE CLAIMS ACT VIOLATIONS**
**31 U.S.C. § 3729(a)(1)(B)**

198.    Relator hereby incorporates and re-alleges paragraphs 1 through 197 as though fully set forth herein.

199.    Defendants NSPC, CFPM, Capitol Spine, NSPC Holdings, Manhattan Spine, and New York Spine, by and through their agents, officers, employees, and principal owners, including defendants Sentinel, Dey, Fabian, Friedlis, Gordon, Lobel, Loev, Murphy, Wisor, and Zuckerman, have violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or caused to be made or used, false records or statements material to claims for reimbursement paid by the government healthcare programs for, among other things, up-coded and/or unnecessary services, unnecessary and worthless drug tests, unnecessary and worthless ultrasounds, unnecessary and worthless orthopedic braces, and illegally dispensed schedule II narcotics, including, but not limited to:

        (a)     false patient notes, orders, and opioid prescriptions;

        (b)     misleading photographs of the ultrasound scanner next to patients' joints; and

(c)     false and misleading certifications on each Form CMS-1500 submitted.

200.    In engaging in the conduct alleged above, the Defendants acted "knowingly" as that term is defined in 31 U.S.C. § 3729(b)(1), in that they acted with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information.

201.    The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial and is therefore entitled to treble damages under the FCA plus a civil penalty of $5,500 to $11,000 for each violation.

**COUNT III**
**FEDERAL FALSE CLAIMS ACT VIOLATIONS**
**31 U.S.C. § 3729(a)(1)(C)**

202.    Relator hereby incorporates and re-alleges paragraphs 1 through 201 as though fully set forth herein.

203.    Defendants NSPC, CFPM, Capitol Spine, NSPC Holdings, Manhattan Spine, and New York Spine, by and through their agents, officers, employees, and principal owners, including defendants Sentinel, Dey, Fabian, Friedlis, Gordon, Lobel, Loev, Murphy, Wisor, and Zuckerman, agreed to engage in the fraudulent business practices and strategies described herein, and conspired to knowingly present or cause the presentation of false or fraudulent claims to the government healthcare programs for payment for, among other things, up-coded and/or unnecessary services, unnecessary and worthless drug tests, unnecessary and worthless ultrasounds, unnecessary and worthless orthopedic braces, and illegally dispensed schedule II narcotics.

204.    Accordingly, the Defendants conspired to commit violations of 31 U.S.C. §§ 3729(a)(l)(A), (B), and (G) in violation of 31 U.S.C. § 3729(a)(l)(C).

205.    The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial and is therefore entitled to treble damages under the FCA plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT IV
## FEDERAL FALSE CLAIMS ACT VIOLATIONS
## 31 U.S.C. § 3729(a)(1)(G)

206.    Relator hereby incorporates and re-alleges paragraphs 1 through 205 as though fully set forth herein.

207.    Defendants NSPC, CFPM, Capitol Spine, NSPC Holdings, Manhattan Spine, and New York Spine, by and through their agents, officers, employees, and principal owners, including defendants Sentinel, Dey, Fabian, Friedlis, Gordon, Lobel, Loev, Murphy, Wisor, and Zuckerman, violated 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or caused to be made or used, false records or statements material to obligations to pay money to the United States and knowingly concealed obligations to pay money to the United States, including, but not limited to, failing to return the funds that they and others obtained through the false claims alleged herein as well as the penalties that the government healthcare programs would have imposed had they become aware of the Defendants' fraudulent practices and schemes.

208.    In engaging in the conduct alleged above, the Defendants acted "knowingly" as that term is defined in 31 U.S.C. § 3729(b)(1), in that they acted with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information.

209.    The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those

claims and has been damaged in an amount to be proven at trial and is therefore entitled to treble damages under the FCA plus a civil penalty of $5,500 to $11,000 for each violation.

## VII. PRAYER FOR RELIEF

210.    WHEREFORE, Relator, on behalf of the United States, demands that judgment be entered in her favor and against all defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count. This includes three times the amount of damages to the United States plus civil penalties of no more than Eleven Thousand Dollars ($11,000.00) and no less than Five Thousand Five Hundred Dollars ($5,500.00), for each false claim, and any other recoveries or relief provided for under the FCA.

211.    Further, Relator requests that she receive the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator requests that her award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities who are not parties to this action.

## VIII. JURY TRIAL DEMAND

A jury trial is demanded in this case.

## CERTIFICATE OF SERVICE

I hereby certify that I have this 14th day of September 2015 caused a copy of the above Complaint to be served on the following counsel by certified mail, return receipt requested:

Hon. Loretta E. Lynch
Attorney General
United States of America
United States Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530

Hon. Dana J. Boente
United States Attorney
Eastern District of Virginia
600 East Main Street, Suite 1800
Richmond, VA 23219-2447

David Haynes

DATED:  September 14, 2015

Respectfully submitted,

David E. Haynes (Virginia Bar I.D. 41530)
William Atkinson
THE COCHRAN FIRM
1100 New York Ave., NW, Suite 340 West
Washington, D.C. 20005
Tel: 202-682-5800
dhaynes@cochranfirm.com
watkinson@cochranfirm.com

Jeanne A. Markey
Gary L. Azorsky
Casey M. Preston
COHEN MILSTEIN SELLERS & TOLL, PLLC
1717 Arch Street, Suite 3610
Philadelphia, PA 19103
Tel: 267-479-5700
jmarkey@cohenmilstein.com
gazorsky@cohenmilstein.com
cpreston@cohenmilstein.com

*Counsel for the Relator*

66